*No. 24-10132*

IN THE

# United States Court of Appeals

FOR THE ELEVENTH CIRCUIT

⟫ ⟪

COMMODITY FUTURES TRADING COMMISSION,

*Plaintiff-Appellee,*

*against*

OASIS INTERNATIONAL GROUP, LIMITED, et al.,

*Defendants,*

MICHAEL J. DACORTA,

*Defendant-Appellant.*

———————————

*On Appeal from the United States District Court*
*for the Middle District of Florida*
*Honorable Sean P. Flynn*
*Case No. 8:19-cv-00886-VMC-SPF*

## BRIEF FOR DEFENDANT-APPELLANT

LAW OFFICE OF STEPHEN N. PREZIOSI PC
*Attorneys for Defendant-Appellant*
48 Wall Street, 11th Floor
New York, New York 10005
212-960-8267

 (212) 719-0990
appeals@phpny.com

# U.S. COURT OF APPEALS FOR THE ELEVENTH CIRCUIT

## CERTIFICATE OF INTERESTED PERSONS AND
## CORPORATE DISCLOSURE STATEMENT (CIP)

CFTC _____ *vs.* DACORTA _____ Appeal No. 24-10132 _____

11th Cir. R. 26.1-1(a) requires the appellant or petitioner to file a Certificate of Interested Persons and Corporate Disclosure Statement (CIP) with this court within 14 days after the date the case or appeal is docketed in this court, and to include a CIP within every motion, petition, brief, answer, response, and reply filed.  Also, all appellees, intervenors, respondents, and all other parties to the case or appeal must file a CIP within 28 days after the date the case or appeal is docketed in this court.  **You may use this form to fulfill these requirements.**  In alphabetical order, with one name per line, please list all trial judges, attorneys, persons, associations of persons, firms, partnerships, or corporations that have an interest in the outcome of this case or appeal, including subsidiaries, conglomerates, affiliates, parent corporations, any publicly held corporation that owns 10% or more of the party's stock, and other identifiable legal entities related to a party. *(Please type or print legibly)*:

J. Alison Auxter, attorney for CFTC in U.S. District Court
_____

Joseph Anile,  co defendant  last known to be in custody.
_____

Francisco Duran, co defendant, address unknown.
_____

John Haas, co defendant, address unknown.
_____

Honorable William Jung, trial judge U.S. District Court Middle District of Florida
_____

RONALD KURPIERS  defense attorney in US District Court 805 W. Azeele St. Tampa, Fl 33606
_____

Jeffery C. Le Riche, attorney for CFTC in U.S. District Court
_____

Raymond Montie, co defendant, address unknown.
_____

Burton Wiand, receiver in lower court. 5505 W.Gray St. Tampa, FL 33609
_____

_____

_____

Submitted by:

Signature: _____

Name: Stephen N. Preziosi _____ Prisoner # (if applicable): _____

Address: 48 Wall Street, 11th Floor New York, New York 10005

Telephone #: 212-960-8267

<u>Statement Regarding Oral Argument</u>

The Appellant, Michael J. DaCorta, requests that oral argument be granted. Because of the complexity of the issues and the detail of the facts of the case, oral argument would be beneficial to the parties and this Court as a full discussion with the attorneys would assist the Court in its decision.

# TABLE OF CONTENTS

CERTIFICATE OF INTERESTED PERSONS..........................................................i

STATEMENT REGARDING ORAL ARGUMENT................................................ ii

TABLE OF AUTHORITIES.................................................................... vii

JURISDICTIONAL STATEMENT ..........................................................ix

STATEMENT OF THE ISSUES ..............................................................1

STATEMENT OF THE CASE...................................................................1

    The District Court's Order. ..........................................................1

    Neither DaCorta Nor Oasis Ever Traded Commodities On Behalf Of
    Other Persons..........................................................................2

    The Promissory Notes And Risk Disclosure Agreements. ..............................2

SUMMARY OF THE ARGUMENT ........................................................3

    Introduction...........................................................................3

RELEVANT FACTS AND CIRCUMSTANCES ........................................4

    The Legal Distinction: The Promissory Notes And Loan Agreement Are
    Legally Distinct From Sales Of Commodities On Behalf Of Any Person. ....5

    The Agreement And Risk Disclosures............................................7

    OIG and Michael DaCorta Were Certain That Each Signer Understood
    That They Were Lenders Not Investors – Is 216 Times Enough? ...............10

    The Criminal Case Against Mr. DaCorta .....................................11

    The District Court Relies on Five Factual Sources In Its Motion for
    Summary Judgment ...............................................................12

Source of CFTC Information Relied Upon By The District Court:
Ms. Robinson's Written Declaration ...........................................................13

Source of CFTC Information Relied Upon By The District Court:
Burton Wiand's Declaration. ......................................................................16

Source of CFTC Information Relied Upon By The District Court:
Expert Report of Melissa Davis. ................................................................17

Source of CFTC Information Relied Upon By The District Court:
The District Court's Reliance On The Criminal Proceedings. ....................19

Source of CFTC Information Relied Upon By The District Court:
Testimony of Michael DaCorta. ................................................................19

Source of CFTC Information Relied Upon By The District Court:
Mr. Joseph Anile's Testimony. ..................................................................23

Source of CFTC Information Relied Upon By The District Court:
The Criminal Trial ......................................................................................24

ARGUMENT .............................................................................................................26

POINT I......................................................................................................................26

THE DISTRICT COURT ERRED WHEN IT GRANTED THE MOTION
FOR SUMMARY JUDGMENT IN FAVOR OF THE COMMODITY FUTURES
TRADING COMMISSION ON ALL COUNTS BECAUSE THERE EXIST ON
ALL COUNTS GENUINE ISSUES OF MATERIAL FACT. ...............................26

Introduction..................................................................................................26

The Standard of Review ..............................................................................27

Legal Standard For Summary Judgment .....................................................27

The District Court Erred When It Granted Summary Judgment In Favor
Of The CFTC Under Count One Of The Complaint: Forex Fraud By
Misrepresentation, Omissions, False Statements, And Misappropriation.....29

The District Court's Decision To Grant Summary Judgment ......................31

The District Court Erroneously Relied Exclusively On The Principal
Of Collateral Estoppel .....................................................................32

The Promissory Note and Risk Disclosure Agreement Renders The
Transaction Legally Distinct and Beyond the Reach of the CFTC
Regulation. .....................................................................................34

The District Court Erred When It Granted Summary Judgment In Favor
Of The CFTC Under Count Two Of The Complaint As There Existed
Genuine Issues Of Material Fact As To The Terms Commodity Pool
Operator, Associated Person, Retail Forex Commodity Pool Operator,
And Retail Forex Transactions. .......................................................35

The Loan Programs Are Legally Distinct From The Sale
Of A Commodity On Behalf Of Another Person............................37

Commodity Pool And Count Two: There Is A Genuine Issue Of
Material Fact Regarding The Existence Of A Commodity Pool. .................38

Count Two: The District Court Erred In Finding The Existence of a
Commodity Pool Asserting That Investor Funds Were Aggregated
Into A Single Account ....................................................................39

Count Two: The District Court Erred In Holding That A Commodity
Pool Existed Asserting That Funds Were Invested For The Purpose
Of Trading In Commodity Interests. ...............................................40

Count Two: The District Court Erred When It Asserted That Lenders
Participation Based On A Promissory Note System As Opposed To
Direct Investing Does Not Effect Whether Oasis Should Be Classified
As A Commodity Pool. ...................................................................41

Count Two: The District Court Erred When It Held That The Oasis
Entitles Are Not Qualified As Eligible Contract Participants (ECPs) –
Meaning They Are Exempt From CFTC Regulation – Because The
Lenders, Which The District Court Calls Investors, Are Not ECPs
Because That Holding Is Based Purely On The Fictionalized
Existence Of Commodity Pools. .....................................................42

Under Count Two, The District Court Erred When It Held That
The Oasis Entities Were Commodity Pool Operators, Retail Forex
Commodity Pool Operators, And That DaCorta Was An Associated
Person Thereof. ............................................................................................44

The District Court Erred When It Granted Summary Judgment On
Count Three Because The Oasis Entities Were Not Commodity Pool
Operators And Mr. DaCorta Was Not An Associated Person Of A
Commodity Pool Operator. ...........................................................................46

The District Court Erred When It Granted Summary Under Counts
Four And Five Of The Amended Complaint As Oasis And DaCorta
Never Received Pool Funds And Never Commingled Funds
Regarding Pools That Never Existed. .............................................................49

CONCLUSION .......................................................................................................51

# TABLE OF AUTHORITIES

*Cases*:

*Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986) ...................................28

*Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986) ...............................27

*Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991)..........................27

*Commodity Futures Trading Comm'n v. Amerman*, 645 F. App'x 938, 941-42 (11th Cir 2016) ...........................................................39

*Commodity Futures Trading Comm'n v. Collins*, No. 94 C 4375, 1997 WL 106135, at *2 (N.D. Ill. Feb. 10, 1997)...............................................41

*Haves v. City of Miami*, 52 F.3d 918, 921 (11th Cir. 1995) ...................................28

*Jeffery v. Sarasota White Sox, Inc.*, 64 F.3d 590, 593–94 (11th Cir. 1995).............28

*Seamon v. Remington Arms Co., LLC*, 813 F.3d 983, 987 (11th Cir. 2016) .............27

*Shotz v. City of Plantation*, 344 F.3d 1161, 1164 (11th Cir. 2003) ..........................28

*U.S. Commodity Futures Trading Commission v. Allied Markets LLC*, 371 F.Supp.3d 1035, 1043–44 (M.D.Fla., 2019)....................................28

*Statutes and Regulations*:

Fed.R.Civ.P. 56(c) ...............................................................27

7 U.S.C. §1a(11)(A).............................................................45

7 U.S.C. §1a(18) ................................................................42, 43

7 U.S.C. § 2(c)(2)(B) ...........................................................34

7 U.S.C. §2(c)(2)(C) ................................................34, 46, 47

7 U.S.C. §6b(a)(2)(A)-(C) .................................................29, 31, 38, 41

7 U.S.C. §6k(2) ................................................................46

7 U.S.C. §6m(1) ...............................................................46

7 U.S.C. §6o(1)(A)-(B) ......................................................35

17 C.F.R. §4.20(b)-(c) .......................................................49

17 C.F.R. §4.21 ...............................................................50

17 C.F.R. §5.1(d)(1) ..........................................................45

17 C.F.R. §5.2 .............................................................29, 30

17 C.F.R. §5.3(a)(2) ..........................................................46

## JURISDICTIONAL STATEMENT

This case involves an appeal after the district court granted summary judgment pursuant to Fed. R. Civ. P. 56. This Court has appellate jurisdiction under 28 U.S.C. §1291. This appeal was taken from the district court's decision to grant summary judgment in favor of Plaintiff on December 6, 2023 by the Honorable Virginia Hernandez Covington. The notice of appeal was timely filed on January 5, 2024.

<u>STATEMENT OF THE ISSUES</u>

The principal issue in this case is whether there exist genuine issues of material fact that preclude summary judgment. The issues, dealt with in one legal point in this brief, can be placed into two sub-categories:

The first legal issue is whether the loan agreements and risk disclosure agreements that existed between the Oasis International Group and each lender created a legally distinct entity that traded in commodities on its own behalf and not on behalf of the lenders, precluding a finding that Mr. DaCorta solicited funds from persons for the purpose of trading in commodities on their behalf.

The second legal issue is whether, under the statutes and related regulations of the Commodity Exchange Act, there existed within Mr. DaCorta's business (the Oasis entities), a commodity pool and whether Oasis was a commodity pool operator or retail forex commodity pool operator, and whether Mr. DaCorta was an associated person of a commodity pool operator.

<u>STATEMENT OF THE CASE</u>

*The District Court's Order*.

The district court granted summary judgment in favor of the Commodity Futures Trading Commission on five causes of action, holding that: 1) defendants, in connection with retail forex transactions cheated or defrauded pool participants and deceived pool participants; 2) the Oasis entities created a commodity pool and

acted as commodity pool operators and that Mr. DaCorta acted as an associated person of a commodity pool operator; 3) defendants failed to register as commodity pool operators and as associated person of a commodity pool operator; 4) defendants failed to receive pool funds in pools' name and commingled pool funds; and 5) defendants failed to provide pool disclosures. The district court issued an injunction against Mr. DaCorta; ordered restitution in the amount of $53,270,336.08; and ordered a civil penalty in the amount of $2,817,876.16.

*Neither DaCorta Nor Oasis Ever Traded Commodities On Behalf Of Other Persons*.

Mr. DaCorta and the Oasis entities, Oasis International Group (OIG) and Oasis Management (OM), never traded in commodities on behalf of any of the lenders to Oasis, rather they established a loan program where lenders entered into a Promissory Note Agreement and Agreement with Risk Disclosures. The lenders were promised repayment of principal and interest or transaction fees. No trading of commodities (no forex trading) was ever done on their behalf and Mr. DaCorta and Oasis only traded on their own accounts. The lenders have a contractual agreement with the Oasis entities and Oasis has a continuing legal obligation to repay the lenders principal and interest on those loans.

*The Promissory Notes And Risk Disclosure Agreements*.

The Promissory Notes and Agreement with Risk Disclosures between the lenders and Oasis are binding legal contracts and have legal force and effect. It was

agreed between the parties and understood that each lender was contributing a loan to the Oasis entities; a loan that was to be repaid including both principal and interest or transaction fees. No commodities were traded on behalf of any other person by Oasis or by Mr. DaCorta. Therefore, no commodity pools existed, and Oasis was not a commodity pool operator or retail forex commodity pool operator, and Mr. DaCorta was not an associated person of a commodity pool operator.

## SUMMARY OF THE ARGUMENT

### *Introduction*

The lawsuit is predicated on the assertion that Mr. DaCorta and the Oasis entities were soliciting funds from customers for the purpose of investing those funds in a forex exchange and pooling these funds into commodity pools. The CFTC begins with the assumption that there existed commodity pools; that the Oasis entities were commodity pool operators (CPOs) or retail forex commodity pool operators; and that Mr. DaCorta was an associated person (AP) of a CPO. However, while the entire premise of the CFTC's lawsuit is that there existed commodity pools, commodity pool operators and associated persons, there is no factual basis to support these assertions. The supporting documentation relied on by the CFTC and the district court lacks any genuine analysis and proof that commodity pools existed or that Mr. DaCorta and the Oasis entities solicited funds and then purchased commodities on behalf of other people.

Thus, the CFTC was not authorized to bring the action against Mr. DaCorta or the Oasis entities. Each of the persons providing funds to Mr. DaCorta and the Oasis entities was a lender. They each signed a loan agreement to which was attached three things: 1) a Promissory Note, promising to payback each person in principal, interest, and fees; 2) an Agreement setting forth the terms of the loan, explaining that payments to lenders were not tied or related to profits or losses in any Oasis investments; 3) finally, the documents contained a lengthy Risk Disclosures section, explaining all the risks that their loans were subject to, along with a description of the types of investments that Oasis would be making. Each of the lenders was required to sign both the Promissory Note and the Risk Disclosure Agreement before they were permitted to enter into the loan transaction with Oasis.

## RELEVANT FACTS AND CIRCUMSTANCES

Michael DaCorta incorporated Oasis Management, LLC (OM) in November 2011. (Doc. #750 at ¶ 11). From November 11, 2011 to April 15, 2019, he was a General Partner and Chief Executive Officer of OM. (Doc. #750 at ¶ 11). With the assistance and legal direction of attorney Joseph Anile, he formed Oasis International Group (OIG), Limited and served as a member of that entity as well as serving on OIG's board of directors and as CEO. (Doc. # 750 at ¶ 12)

OIG and OM (the "Oasis entities") are diversified corporations engaged in investments designed to produce varied revenue streams from real-estate purchases

and sales; business purchases, operations, and sales; Foreign Exchange (Forex) Trading; precious metal investing, along with other business endeavors. (Doc. # 750 at ¶ 17).

OIG was the sole customer of Broker-Dealers OG Ltd and OGSA. OIG did not trade for any individual resident of the United States or any group of residents in the United States in any capacity. (Doc. #750 at ¶ 19). All of the people referenced by the CFTC were lenders who all signed Promissory Notes and Loan Agreements along with Agreements with Risk Disclosures. (Doc. #750 at ¶¶ 19, 20).

### *The Legal Distinction: The Promissory Notes And Loan Agreement Are Legally Distinct From Sales Of Commodities On Behalf Of Any Person*.

Both the CFTC and the district court fail to recognize the legal distinction between the lenders associated with the Oasis entities and the existence of commodity pools, commodity pool operators, retail forex commodity pool operators, and associated persons and whether OIG was an Eligible Contract Participant (ECP), operating outside the scope of CFTC authority. Most importantly, Oasis did not trade in commodities *on behalf* of the lenders. The lenders were compensated by repayment of principal and interest or transaction fees. Their compensation was never tied to profits and losses from the sale of commodities.

This is a legal distinction that makes a difference. Because DaCorta and Oasis were not trading in commodities *on behalf* of any person, but solely for a corporate ECP, and because the lenders were not compensated based on profits and losses,

they were not investors in commodity pools; Oasis was not a commodity pool operator; DaCorta was not an associated person of a commodity pool operator, and neither Oasis nor DaCorta were required to register as such.

All the people referred to by the CFTC as investors were not investors at all; they were lenders. Each of them signed a promissory note for any and all monies lent to OIG and OM. Each of them also signed an Agreement and Risk Disclosure document, describing the risks associated with lending OIG money. (Doc. #750 at ¶ 22).

The first paragraph of the Promissory Note and Loan Agreement states the following:

## PROMISSORY NOTE AND LOAN AGREEMENT

*FOR VALUE RECEIVED, the undersigned, Oasis International Group, Ltd., a Cayman Island corporation having its registered office at 309 Ugland House, Grand Cayman, KY1- 1104, Cayman Islands (the "Maker"), hereby promises to pay to (the "Payee"): (i) in lawful monies of the United States, in immediately available funds, the principle sum of LOAN AMOUNT ( ) (the "Loan Amount") in one (1) installment or as otherwise directed by Payee pursuant to the terms hereof.*
(See Doc. 750-1 at 1)

Each of the lenders involved in this case signed the agreement, stating that they were lenders, not investors, and that they would be paid back in a combination of principle and interest or transaction fees. The Promissory Note and Loan

Agreement stated the following repayment terms for each of the lenders in paragraph one of the Agreement:

> **Interest**. *Any unpaid Loan Amount due hereunder shall receive the greater of (a) interest calculated at the rate of twelve percent (12.00%) per annum, or (b) twenty-five percent (25.00%) of the Transaction Fees (as hereinafter defined), provided, that upon the occurrence of an Event of Default (as hereinafter defined), the unpaid Loan Amount hereof shall bear interest at the maximum rate of interest permitted by the law of the jurisdiction of the Payee from the date of such Event of Default until the default is cured.*
> (See Doc. #750-1 at 1)

The Promissory Note and Loan Agreement makes clear that the Lenders are to be paid back in interest, as is customary in lending agreements. Most importantly, nothing in the agreement states that any Oasis entity or Michael DaCorta is investing on behalf of the Lenders, and it is expressly clear that repayment to each of the lenders is in interest or fees collected. Each of the people referred to in the district court's decision and in the CFTC's amended complaint and motion for summary judgment as investors were not investors; they were lenders.

## The Agreement And Risk Disclosures

In addition to signing a Promissory Note and Loan Agreement, the lenders signed an Agreement and Risk Disclosure document, which set forth the terms of the loan that each of them was making, along with all risks. (Doc. 750-1 at 4). The Agreement expressly described the transaction as a loan. It stated in part: **Short-Term Unsecured Loan.** *By signing the Promissory Note and Loan Agreement,*

*Lender is loaning Oasis money on a short-term unsecured basis.* (Doc. #750-1 at 4).

These signing documents made clear to every lender that this was a loan that would be paid back with a combination of principal, interest, and fees. It was not money given to any of the Oasis entities and Michael DaCorta for the purpose of investing on their behalf in commodities, and repayment was never associated or tied to profits and losses.

The Agreement and Risk Disclosures document described the transaction as follows in paragraph one, page one:

## AGREEMENT AND RISK DISCLOSURES

*This Agreement sets forth the terms and conditions governing your Loan Account ("Account") at Oasis International Group, Ltd. ("Oasis"), and all agreements and any transactions in this Account with Oasis. In this Agreement, the undersigned lender is referred to as "Lender" or "You".*
(Doc. #750-1 at 4)

The first sentence of the document on page one defines the transaction between OIG and the lenders as a "Loan Account." The parties giving OIG money are defines as "Lenders." The document defines the transaction as a "Short-Term Unsecured Loan.":

***Short-Term Unsecured Loan**. By signing the Promissory Note and Loan Agreement, Lender is loaning Oasis money on a short-term unsecured basis. There is no collateral provided by Oasis to the Lender in connection with any money, including any interest thereon, loaned to Oasis by Lender. if Oasis becomes insolvent and You have a claim for amounts loaned or interest earned on transactions with Oasis, your*

*claim may not receive a priority. Without a priority, You are a general creditor and your claim will be paid, along with the claims of other general creditors, from any monies still available after priority claims are paid.*
(Doc. #750-1 at 4)

The Risk Disclosures document stated that any money or payments given to OIG were short-term unsecured loans that would be paid back with interest. Additionally, lenders were informed that in the event that OIG becomes insolvent, the lenders would become general creditors:

***Loans and Withdrawals****. Any loan made by You will require that You complete (or update) the information on the Application so that a Promissory Note and Loan Agreement can be generated for acceptance by Oasis. Payments from an Account require a withdrawal request form signed by all required account holders and submitted in writing to Oasis. A withdrawal of any loan principal amount will be made, in accordance with the terms and conditions of the Promissory Note and Loan Agreement, upon ninety (90) days advance written notice from Lender to Oasis. A withdrawal of any unpaid interest amount may only be made by Lender on or by the last day of a calendar month.*
(Doc. #750-1 at 4).

In addition to defining the transaction between the lenders and OIG as an unsecured loan, the Risk Disclosure, on page one of the document, describes in detail how OIG intends to use the loaned funds. OIG will use "*any or all of the money loaned by Lender*" at its discretion to invest in a variety of things. It stated:

***Use of Funds****. At any time, in Oasis' sole discretion and without prior demand or notice, Oasis may use any or all money loaned by Lender, including any interest thereon, for any purpose whatsoever including without limitation any investment; the purchase or sale of foreign exchange products, securities or commodities, exchange or off-exchange products; the purchase or sale of any businesses assets or*

*liabilities, the purchase or sale of any real estate; or for any other purpose, including any general company use or payment, any company payment or loans to any company affiliate, officer, employee, or third party, any company indebtedness or other company obligations. Lender hereby agrees that Oasis may, at any time and from time to time, in the sole discretion of Oasis, apply and transfer from any of Lender's funds with Oasis to any of Oasis' other accounts, whether held at Oasis or other individuals or entities in connection with any Oasis investment. Lender hereby authorizes Oasis to sell, pledge, rehypothecate, assign, invest, commingle and otherwise use any money loaned to it by Lender, including any interest thereon. Where Lender's Loan Account consists of more than one loan, this authorization shall apply to all loans, including any interest thereon.*
(Doc. # 750-1 at 4-5).

The Use of Funds clause of the document, set out on page one of Risk Disclosures, continued to emphasize that the monies given to OIG were loans and the people entering into these transactions were lenders who would be paid back with interest. The money made by lenders was never tied to profits and losses and OIG was not investing on their behalf.

## *OIG and Michael DaCorta Were Certain That Each Signer Understood That They Were Lenders Not Investors – Is 216 Times Enough?*

The words "loan" and "lender" appear in the Promissory Note And Loan Agreement and Risk Disclosure documents a total of two hundred and sixteen (216) times. The document imposes obligations on the lenders as well. Each of the lenders had to assure OIG and Mr. DaCorta that they had read and understood the documents and that they knew the money they were lending OIG was to be used in a variety of ways. Paragraph four of the Risk Disclosure document states:

*Lender has read and understands the provisions contained in this Agreement, including, without limitation, Oasis' risk disclosure statements herein contained. Lender will review the Agreement each time it is amended, as provided herein. Lender will not lend Oasis any money unless Lender understands Oasis' revised Agreement, and Lender agrees that in effecting any continuation of a loan or any interest thereunder, Lender is deemed to represent that Lender has read and understands Oasis' revised Agreement as in effect at the time of such loan.*

(Doc. #750-1 at 5)

The acceptance of the loans was conditioned upon the signed assurance of each lender, promising OIG and Mr. DaCorta that they understood that they were lenders and not investors, and that they were to be repaid in principal, interest, and fees collected. Furthermore, they knew that the types of products being invested in by OIG were high risk in nature. This was expressly stated on page one of the Risk Disclosure document.

## *The Criminal Case Against Mr. DaCorta*

The district court relied heavily on the transcripts in Mr. DaCorta's criminal trial, asserting that he was foreclosed under the principal of collateral estoppel from arguing that he defrauded investors. (Doc. 780 at pgs. 14, 25).

Michael DaCorta was indicted on December 17, 2019 charging him with three counts: 1) conspiracy to commit wire fraud and mail fraud under 18 U.S.C. §§ 1349, 1343, and 1341; 2) money laundering under 18 U.S.C. § 1957; and 3) false and fraudulent statement on income tax return under 26 U.S.C. § 7206(1) and 18 U.S.C. § 2. (Doc. 749-11).

At a jury trial, the government never proved that there existed a commodity pool, a commodity pool operator, a retail forex commodity pool, associated persons, or that OIG was not an eligible contract participant, or that any retail commodity transactions occurred on behalf of any person. This was significant because the CFTC and the district court later assert that these facts were established in the criminal trial.

Because the district court's decision to grant summary judgment in favor of the CFTC relies heavily on the criminal trial transcripts and the declarations of two experts, Ms. Elsie Robinson and Ms. Melissa Davis, as well as the declaration of the receiver, Burton Wiand, it is necessary to discuss the shortcomings of that evidence.

*The District Court Relies on Five Factual Sources In Its Motion for Summary Judgment*

The district court relies on five factual sources in its decision for summary judgment. The first two sources are the declarations of Burton Wiand (the appointed receiver in the case below) (Doc. #165-1) , and Elsie Robinson (a Futures trading investigator in the division of enforcement of the Commodity Futures Trading Commission) (Doc. #4-1). Although widely cited in the CFTC's motion for summary judgment and adopted by the district court in its decision to grant summary judgment, neither support a finding of the existence of a commodity pool, commodity pool operators or associated persons as defined under the Commodity

Exchange Act. Ms. Robinson was not a witness in the court below and was never cross-examined by defense counsel in the civil case.

The third source in the CFTC's motion is the report of the accountant Ms. Melissa Davis. (Doc. #439-7) Ms. Davis was not a witness at the criminal trial and was not deposed in the civil case. Fourth, the district court indirectly relies on the transcribed phone calls of Mr. DaCorta (as they are cited in both Robinson's and Wiand's declaration) and several other people involved in the criminal case. Some of those transcripts are attached to Mr. Wiand's declaration. No transcripts of phone calls are attached to Ms. Robinson's declaration and are not attached to the CFTC's motion. Finally, the main source of facts in the CFTC's motion were the trial transcripts from Mr. DaCorta's criminal trial.

*Source of CFTC Information Relied Upon By The District Court: Ms. Robinson's Written Declaration*

Ms. Robinson's declaration is cited extensively in the CFTC's motion and by reference to that motion is widely cited by the district court in its decision. (See Doc. # 749 CFTC Motion for Summary Judgment ¶¶ 4, 9, 10, 11, 20, 21, 22, 26, 27, 28, 35, 38, 40, 48, 49 51, 52, 62, 70). Ms. Robinson's statement relies mainly on recorded phone calls with Mr. DaCorta and other Oasis employees. No recording of the phone calls cited or transcript of the phone calls were attached or provided in conjunction with her declaration.

Ms. Robinson assumes in her declaration that there existed commodity pools and that Mr. DaCorta and the Oasis entities were commodity pool operators. (Doc. 4-1 at 13). Robinson takes great pains to repetitively and heavy-handedly use the terms Oasis pools, pool funds, and pool investors to refer to money deposited in Oasis accounts (she uses these terms 99 times in her declaration). No fact-based explanation or analysis is provided in her declaration as to how she made the determination that these funds were pool funds of commodity pools. Ms. Robinson also, without analysis or explanation, uses the terms "Oasis pool participants" and "pool participants" and "Oasis pools" with gay abandon, providing no fact-based or legal explanation for these conclusions.

In fact, throughout Robinson's declaration there is no legal analysis or fact based explanation for the conclusion that there existed commodity pools, pool funds, or pool participants.

Robinson cites secondhand information from an interview with a financial advisor in Wisconsin who claimed to have participated in a conference call with Mr. Ray Montie, another named defendant. (Doc. # 4-1 at 13). No recording or transcript of the conversation was provided and none of the people who participated in the call are identified.

Robinson also states that she listened to a number of recorded calls in which members of the Oasis entities were speaking with prospective lenders. Robinson

refs to the lenders as prospective pool participants, inferring without explanation or analysis that there existed commodity pools and that DaCorta and Oasis were commodity pool operators. She cites to several such recorded conversations (Doc. # 4-1 at pgs. 14-22); no transcripts of those recordings are attached to her declaration.

While cited extensively by the CFTC and the district court in support of the proposition that there existed commodity pools, commodity pool operators, retail forex commodity pool operators, and associated persons, the Robinson Declaration contains no legal analysis or explanation as to how DaCorta and Oasis meet these legal definitions.

The CFTC claims that Ms. Robinson listened to phone calls with one of the co-defendants of Mr. DaCorta and claims that he used the term "pool participants" in his phone call with lenders. The recordings referenced by Ms. Robinson in her declaration were not provided to the district court and have not been provided to defense counsel. However, in one conversation that Ms. Robinson alleges that she listened to between Mr. DaCorta and one of the lenders, it becomes clear that Ms. Robinson is deliberately altering the language used by DaCorta, changing his words from "lender" to "pool participant". The quoted conversation from Ms. Robinson's declaration is as follows:

*On April 8, 2019 I listened to a recorded telephone conversation between Person 2 and Defendants Duran and DaCorta that occurred in April 2019 during which DaCorta stated the following:*

*a. DaCorta is Oasis's principal and signs the loan agreements with Oasis pool participants;*
*b. new Oasis pool participants are approved by "Deb or Joe Paniagua;"*
*c. new Oasis pool participants are approved once the pool participant sends the money and Joe Paniagua "will see that and approves your status;"*
*d. new Oasis pool participants' notes and other documents "will be automatically be uploaded into our system ...it's called the back office;"*
*e. accounts can't be activated until Oasis receives funds from pool participants;*
*f. Joe Anile "gets all of the wires, he checks the bank accounts and lets Joe Paniauga know" that a new Oasis pool participant is approved*
(Doc. #4-1 at 20)

The transformation of language by Ms. Robinson is significant. In this conversation, Mr. DaCorta is talking to a prospective lender about a loan agreement, yet Ms. Robinson's chooses to use the term "pool participant" repeatedly, a term DaCorta never used in any of the transcribed conversations.

## *Source of CFTC Information Relied Upon By The District Court: Burton Wiand's Declaration.*

On April 15, 2019, Burton Wiand was appointed receiver by the district court. His declaration is cited numerous times in the CFTC motion and by reference adopted by the district court in its decision. (See Doc. 749 at ¶¶ 4, 8, 13, 14, 15, 19, 26, 27, 29, 30, 31, 32, 33, 34, 39, 44, 46).

Mr. Wiand states in his declaration that he listened to several phone calls where Mr. DaCorta and other Oasis members speak with lenders. (Doc. 165-1 at 7). Mr. Wiand attached as exhibits to his declaration transcripts of the phone calls that

he uses as support for his conclusions. Wiand's conclusions were used in the CFTC's motion and in the district court's decision, but are not supported by the transcripts of the phone calls between Mr. DaCorta and the lenders to Oasis.

For example, Mr. Wiand concludes that the people Mr. DaCorta spoke to were potential "investors" and that "profits" are purportedly generated from trading currencies. (Doc. #165-1 at ¶15) The transcripts of the phone calls do not support these conclusions. In fact, in each phone call DaCorta makes clear that the transaction is that of lender-borrower and that the lenders will be paid in interest, not in profits from currency trading. (Doc. 165-5 at 26-29). Mr. Wiand concludes that the phone calls were for the purpose of soliciting "pool participants." (Doc. 165-1 at 8). However, in each transcript of the phone calls it is made clear to the prospective lenders that they would be lending money to Oasis and would be paid in principal, interest or fees. (Doc. 165-5 at 26-29).

*Source of CFTC Information Relied Upon By The District Court: Expert Report of Melissa Davis*.

The CFTC and the district court relied in part on the expert report of Ms. Melissa Davis, a CPA for the accounting firm of Kapila Mukamal. (Doc. # 439-7).

While Ms. Davis concludes that the Oasis entities acted as a Ponzi scheme based on her analysis of the financials, her conclusions regarding any commodities violations are drawn exclusively from the CFTC's complaint. She states that Oasis operated as a commodity pool operator by soliciting, receiving, and accepting funds

for trading in forex. (Doc. 439-7 at 6) The support for this conclusion in Ms. Davis' report is a citation to the CFTC's complaint. No other independent analysis is offered. Ms. Davis also asserts the following: 1) the Oasis entities offered securities for sale to investors; 2) investors were guaranteed an annual rate of return of 12%; 3) Oasis represented to investors that their money would be used to trade in forex contracts; Oasis pools would earn substantial income. The support for these conclusions in Ms. Davis' report was a reference to the CFTC's complaint. (Doc. 439-7 pg. 7) No other independent source or analysis for these conclusions was offered by Ms. Davis.

Ms. Davis' report is as significant for what it omits as it is for what it includes. Davis refers to the Promissory Note offered by Oasis and makes assertions that are contradicted by the plain language in the Promissory Note and Risk Disclosure documents.[1] For example, she asserts that the lenders were told that Oasis did not lose money in the forex trading activity, referring to the promissory note. (See Doc. 439-7 at 12). However, the Promissory Note and Risk Disclosure both go into great detail about the risks involved in forex trading and state that each lender could lose the entirety of their money. Davis also asserts that lenders were told that their money would be used for forex trading exclusively. (Doc. 439-7 pg. 13). This statement is

---

[1] Ms. Davis adopts the language used by the CFTC in their complaint and generally refers to the lenders as investors. (See Doc. 439-7 generally).

contradicted directly by the Promissory Note and Risk Disclosure Agreement wherein Oasis described at length the variety of investments for which lenders' money would be used.

*Source of CFTC Information Relied Upon By The District Court: The District Court's Reliance On The Criminal Proceedings*.

The district court's reliance on the CFTC's assertions and conclusions from the criminal court proceedings is misplaced. At no time during the criminal proceedings was it proven, or even mentioned, that there existed investor pools, commodity pools, retail forex commodity pools, commodity pool operators, associated persons of commodity pool operators, or the investments or solicitation of funds on behalf of another person, as is required under the Commodity Exchange Act for the existence of such entities and for a finding of summary judgment. Asserting that Oasis solicited funds from pool participants, the CFTC directs the district court's attention to Days 10 and 11 of Mr. DaCorta's criminal trial (Doc. # 749-5 at pgs. 248 to 255; Doc. # 749-3 at pgs. 45, 46, 50, 52, and 204).

There are no facts in those transcripts that demonstrate that Mr. DaCorta or Oasis solicited any funds for foreign exchange trading on behalf of any person.

*Source of CFTC Information Relied Upon By The District Court: Testimony of Michael DaCorta*.

To support the contention that Mr. DaCorta solicited money from "pool participants", the CFTC cites to Mr. DaCorta's testimony at his criminal trial

misrepresenting the actual words that Mr. DaCorta used. (Doc. # 749 at pg. 10). The cited testimony of Mr. DaCorta is as follows:

*Q You would at least agree with me, would you not, that all the trading money in the ATC account was lender money, correct?*
*A It all came through the loan program, yes.*

(Doc. # 749 at pg. 10)

The CFTC cited to the preceding testimony and claims in their motion for summary judgment that Mr. DaCorta said that he was receiving money from pool participants. Again, consistent with Ms. Robinson's misrepresentations, the CFTC misquoted Mr. DaCorta to conform to their contention that the actions of Mr. DaCorta fall within the regulatory ambit of the CFTC.

Furthermore, the CFTC contends in their motion for summary judgment at Doc. # 749 at ¶ 25 that Mr. DaCorta was sharing in profits and losses with the people who were lenders. They cite to Mr. DaCorta's testimony at his criminal trial:

*So, the back office was all Oasis International Group accounts. The subaccounts were all Oasis's accounts, but what we had to do if 100 people loan you money and it's all different amounts and every single person is being allocated spreads on a daily basis, the only way to keep that accurate is to have that ledger in the back office that accounts for each and every transaction every single day. At the end of the month, your loan to me was a hundred thousand dollars. I still owe you a hundred thousand dollars plus whatever that spread was. So, if you withdrew your interest, you now have principal only back there. If we had a profit one month, it had to be reduced. If we had a loss, it had to be put back.*
*So, in other words, the only way to keep the integrity of how much everybody's loan represented and how much interest they were being allocated on a daily and monthly basis was the end of the month that*

*number had to be brought back to the principal amount of their loan.*
**The P&L shifted to our side, whether it was profitable or whether it**
**was a loss.** *That was the company responsibility as we stated many*
*times. But for each person, in order for us to keep track of that loan, we*
*needed the actual amount we owed them, the principal amount, plus*
*any accrued interest, if they left it there, added together to come up with*
*the amount that we now had to put into the PAMM account which then*
*received all the spreads based on the transaction fees.*
(Doc. # 749-3 at pg. 160) [emphasis added].

"*The P&L shifted to our side, whether it was profitable or whether it was a*

*loss.*" Mr. DaCorta did not testify that lenders were paid according to profits and

losses. He stated that they were paid in principal and interest or transaction fees

according to the loan agreement. To support the contention that the lenders to OIG

were paid in profits and losses, the CFTC also makes a partial citation at Doc. # 749

at ¶ 25 to Mr. Paniagua's testimony at the criminal trial:

> *Q Okay. Let me ask it this way. On a given day if the foreign currency*
> *trading resulted in a hundred thousand dollars in profit, would that*
> *profit show up in the PAMM subaccounts that belonged to the lenders?*
> *A Yes, it should show up. It should show up in that PAMM account but*
> *remember it's a loan program. And the funds are loans to Oasis. So, it's*
> *different. The P&L was just Oasis, belonged to Oasis itself.*
> (Doc. # 749-7 at pg. 196).

The P&L, or profits and losses, were attributed to Oasis – *they belonged to*

*Oasis itself*. The lenders money was never impacted by profits and losses. Mr.

Paniagua's testimony at the criminal trial does not support the contention made by

the CFTC in their motion for summary judgment and relied upon by the district

court. He testified that any profits or losses were attributed to Oasis and never

devolved to the lenders. The CFTC chose to omit this part of his testimony in their motion for summary judgment.

The CFTC asserted in their motion for summary judgment at Doc. # 749 at ¶ 26 that Mr. DaCorta routinely participated in conference calls to solicit prospective pool participants to join the Oasis pools. To support this assertion, they cite to Mr. Burton Wiand's declaration (Doc. # 165-1 at ¶ 18) and Ms. Robinson's declaration (Doc. # 4-1 at ¶ 42).

The noticeable distinction between the statements of Wiand and Robinson as compared to Anile (the government cooperator) and Mr. DaCorta is the obsessive use by Wiand and Robinson of the terms "pool" and "pool participant." Anile and DaCorta never use the words "pool," "pool participant," or investor even once, even though Anile is a government cooperator and testifying on behalf of the government.

In Mr. Wiand's declaration, he refers to transcripts of phone calls of Mr. DaCorta speaking to prospective lenders. While Mr. Wiand refers to commodity pools and solicitation of funds to invest in pools quite liberally in his declaration, a review of the transcripts of phone calls attached to his declaration shows that there was no mention of pools, commodity pools, or investments. Instead, in each of those recorded phone calls, Mr. DaCorta explains to the people that they are "lenders" and that they would be lending money to Oasis pursuant to a Loan Agreement and that they would be paid back in principal and interest or transaction fees. In each

transcript, Mr. DaCorta makes clear to the lenders that their money is not impacted by profits and losses. (Doc. # 165-5 and Doc. # 165-6 Exhibits 1-D and 1-E to Wiand declaration).

*Source of CFTC Information Relied Upon By The District Court: Mr. Joseph Anile's Testimony.*

The CFTC's motion for summary judgment included excerpts from the criminal trial of Mr. DaCorta's former business partner and attorney, Mr. Joseph Anile. Mr. Anile had pleaded guilty to all charges in the indictment and was to receive a lesser sentence for his testimony against Mr. DaCorta and cooperation with the U.S. Attorney's office.

In the CFTC's motion for summary judgment, they assert that there was evidence of "pool participants" sending funds to OIG. They cite to Mr. Anile's testimony at the criminal trial in support of this contention. (Doc. # 749-2 at pgs. 153-157) In the cited pages, there is no testimony regarding pool participants by Mr. Anile and there is no mention of any pool participants. The terms pool, commodity pool, pool participant do not appear anywhere in Mr. Anile's testimony.

At paragraph 17 of the CFTC's motion for summary judgment they assert that payments made to OIG accounts were funds from pool participants (Doc. # 749 at ¶ 17). In Mr. Anile's testimony, he makes the important distinction between lenders and investors. He states that after 2018, the people paying money into OIG accounts were lenders, not investors. He testified as follows:

*Q Where did the deposits into the OIG account held by Mainstream Fund Services come from?*
*A At this point in time in '18 and '19 they were coming from lenders to the company.*
*Q Were they coming from any other source other than lenders?*
*A No.*
*Q What about prior to 2018 and 2019, where did the money that was deposited into -- I guess it would have been the Fund Administration account then; is that right?*
*A Well, the period which we acted as broker to self-traded accounts or managed accounts, they would have been from investors.*
*Q Is there any other source of deposits into that account other than investors?*
*A No.*

(Doc. # 749-2 at pgs. 159-160)

This was significant testimony for two reasons: first, there was no mention of pools, commodity pools, or pool investors. Second, it is demonstrative of the changed nature of the business after 2018 where any payments made to OIG were loans and not investments. All those payments were pursuant to a loan agreement where the lenders were paid back and earned according to the agreed upon interest rate; no payments from OIG to lenders were tied to profits or losses.

*Source of CFTC Information Relied Upon By The District Court: The Criminal Trial*

At no point during the criminal trial was it proven that there existed commodity pools, a commodity pool operator, a retail forex commodity pool operator, or an associated person of any such entity. There was, in fact, significant testimony to the contrary.

During the trial, the government called witness Jennifer Sunu, an employee at the National Futures Association, which is a regulatory organization for U.S. futures and forex trading markets. During Ms. Sunu's testimony, a disagreement about an exhibit led to an argument at side-bar where it was disclosed by the government that no one was going to testify that Mr. DaCorta was a commodity pool operator. Mr. DaCorta's attorney argued as follows:

> MR. ROSENTHAL: The problem -- I mean, there's multiple problems. Number 1 is -- our objection is she is not going to testify, again, that Mr. DaCorta was operating a commodity pool. So therefore, it's not relevant on that ground and that ground alone. So, it's not relevant whether the National Futures Association, at least through her testimony, regulates commodity pools. She's not going to give further testimony, which we have been assured that she won't, that Mr. DaCorta was operating a commodity pool.
> (Doc. 749-6 at pg. 97)
> THE COURT: And why is it relevant? Why is commodity pools relevant? Is someone going to say he's a pool operator?
> MR. MURRAY: No, Your Honor. So, the reason it's relevant, again I'll start by saying we disclosed this in our expert disclosure saying she is testifying to exactly this. The reason it's relevant is because Mr. DaCorta structured the Oasis companies to avoid NFA regulation because he couldn't register as an NFA member based on his settlement.
> (Doc. # 749-6 at pg. 98)

In short, it was never proven at Mr. DaCorta's criminal trial that he was an associated person of a commodity pool operator or that Oasis was a commodity pool operator or that there existed commodity pools at all.

## ARGUMENT

## POINT I

## THE DISTRICT COURT ERRED WHEN IT GRANTED THE MOTION FOR SUMMARY JUDGMENT IN FAVOR OF THE COMMODITY FUTURES TRADING COMMISSION ON ALL COUNTS BECAUSE THERE EXIST ON ALL COUNTS GENUINE ISSUES OF MATERIAL FACT.

### *Introduction*

The district court erred when it granted summary judgment in favor of the Commodity Futures Trading Commission because there exist genuine issues of material fact on all counts. The material issues of fact here are: 1) whether Mr. DaCorta and Oasis entered into forex transactions and/or retail forex transactions on behalf of other people; 2) whether the CFTC had authority to bring suit against DaCorta and Oasis; 3) whether, under the Commodity Act ("the Act"), there existed a commodity pool (i.e. whether the funds lent to Oasis through promissory notes can be classified as the existence of a commodity pool); 4) whether, under the Act, Mr. DaCorta and the Oasis entities were commodity pool operators; 5) whether, under the Act, Mr. DaCorta was an associated person of a commodity pool operator; 6) whether, under the Act, Mr. DaCorta was an Eligible Contract Participant; and 7) whether the funds from lenders were given to Mr. DaCorta for the purpose of trading in commodity interests.

None of the sources of information referenced by the district court in its order show that there is no issue of material fact as to whether there existed a commodity

pool, or whether Mr. DaCorta and Oasis were commodity pool operators, or whether Mr. DaCorta was an associated person, or whether there were forex and retail forex transactions. The lack of proof of any of these material facts precludes a finding of summary judgment.

## The Standard of Review

The Eleventh Circuit reviews the district court's ruling on a motion for summary judgment *de novo*, applying the same legal standards that bound the district court. *Seamon v. Remington Arms Co., LLC*, 813 F.3d 983, 987 (11th Cir. 2016).

## Legal Standard For Summary Judgment

Motions for summary judgment should be granted only when the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c) *Seamon v. Remington Arms Co., LLC*, 813 F.3d 983, 987-88). Genuine, triable issues of fact will preclude summary judgment. *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986).

The party seeking summary judgment bears the initial burden of demonstrating to the Court, by reference to the record, that there are no genuine issues of material fact to be determined at trial. *Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991). "When a moving party has discharged its burden,

the non-moving party must then go beyond the pleadings, and by its own affidavits, or by depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial." *Jeffery v. Sarasota White Sox, Inc.*, 64 F.3d 590, 593–94 (11th Cir. 1995) (internal citations and quotation marks omitted). Substantive law determines the materiality of facts, and "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). In determining whether summary judgment is appropriate, a court "must view all evidence and make all reasonable inferences in favor of the party opposing summary judgment." *Haves v. City of Miami*, 52 F.3d 918, 921 (11th Cir. 1995). *U.S. Commodity Futures Trading Commission v. Allied Markets LLC*, 371 F.Supp.3d 1035, 1043–44 (M.D.Fla., 2019).

If there is a conflict between the parties' allegations or evidence, the non-moving party's evidence is presumed to be true, and all reasonable inferences must be drawn in the non-moving party's favor. *Shotz v. City of Plantation*, 344 F.3d 1161, 1164 (11th Cir. 2003). If a reasonable fact finder evaluating the evidence could draw more than one inference from the facts, and if that inference introduces a genuine issue of material facts, the court should not grant summary judgment.

<u>*The District Court Erred When It Granted Summary Judgment In Favor Of The CFTC Under Count One Of The Complaint: Forex Fraud By Misrepresentation, Omissions, False Statements, And Misappropriation*</u>.

The district court erred in granting summary judgment on count one in favor of the CFTC by using Mr. DaCorta's criminal trial as its main source of factual findings and the principal of collateral estoppel.

In count one it is alleged that Mr. DaCorta violated 7 U.S.C. §6b(a)(2)(A)-(C) and Regulation 17 C.F.R. §5.2. The statute, 7 U.S.C. §6b, is entitled "Contracts designed to defraud or mislead. It states the following:

It shall be unlawful—

> (2) for any person, in or in connection with any order to make, or the making of, any contract of sale of any commodity for future delivery, or swap, that is made, or **to be made, for or on behalf of**, or with, any other person, other than on or subject to the rules of a designated contract market--
> **(A)** to cheat or defraud or attempt to cheat or defraud the other person;
> **(B)** willfully to make or cause to be made to the other person any false report or statement or willfully to enter or cause to be entered for the other person any false record;
> **(C)** willfully to deceive or attempt to deceive the other person by any means whatsoever in regard to any order or contract or the disposition or execution of any order or contract, or in regard to any act of agency performed, with respect to any order or contract for or, in the case of paragraph (2), with the other person
> [emphasis added]

A violation of this statute requires that there be an order to make a contract of sale of a commodity for future delivery, or swap *be made for or on behalf of any other person* and to cheat, defraud, make false reports or records, and willfully

deceive the other person in regard to any order or contract. Regulation 5.2 pertains to retail forex transactions and is consistent with §6b. It states: § 5.2 Prohibited transactions.

(a) Scope. The provisions of this section shall be applicable to any retail forex transaction.

(b) Fraudulent conduct prohibited. It shall be unlawful for any person, by use of the mails or by any means or instrumentality of interstate commerce, directly or indirectly, in or in connection with any retail forex transaction:

(1) To cheat or defraud or attempt to cheat or defraud any person;

(2) Willfully to make or cause to be made to any person any false report or statement or cause to be entered for any person any false record; or

(3) Willfully to deceive or attempt to deceive any person by any means whatsoever.

(See 17 C.F.R. §5.2)

With regard to count one, material issues of fact exist. Neither Mr. DaCorta nor Oasis entered into forex transactions and/or retail forex transactions *on behalf of* the lenders for the purchase of any commodity. (Doc. 750 at pg. 38 and ¶ 44) DaCorta motion). The transaction between the Oasis entities and the lenders was a loan agreement. (Doc. 750 at pg. 38). Neither Oasis nor DaCorta ever entered into a forex or retail forex transaction that was *made for or on behalf of any other person*. There were never any contracts or agreements that either DaCorta or Oasis would purchase commodities or enter into forex or retail forex transactions on behalf of the people that were lenders. (Doc. # 750 at ¶ 38 DaCorta Motion). The loan agreements

were clear. The lenders were to be paid back with principal and interest based on a variety of investments that Oasis would make independently, not investments on behalf of anyone. (Doc. # 750 at pgs. 30-31 DaCorta Motion).

## *The District Court's Decision To Grant Summary Judgment*

The district court erroneously held that, under count one, the CFTC was required to prove three elements to show liability for fraud under 7 U.S.C. §6b(a)(2)(A)-(C). The district court stated that the CFTC must prove 1) the making of a misrepresentation, misleading statement, or a deceptive omission; 2) scienter; and 3) materiality. (Doc. # 780 at pg. 24).

However, the district court truncated drastically that which was required to prove count one in the CFTC's complaint. The CFTC must also prove that DaCorta and Oasis entered into forex transactions and retail forex transactions *on behalf* of other persons and that Oasis was not an Eligible Contract Participant. In other words, the CFTC was required to show that there was a contract between DaCorta/Oasis and the lenders specifically for the purpose of a sale of a commodity, in this case the forex transactions and retail forex transactions. Furthermore, the CFTC was required to prove in this case that there existed commodity pools, commodity pool operators, and that DaCorta was an associated person of a commodity pool operator. No such proof exists in this case and these points are all genuine issues of material fact, precluding a finding of summary judgment.

*The District Court Erroneously Relied Exclusively On The Principal Of Collateral Estoppel*

The district court, relying on the principal of collateral estoppel, held that the jury in the criminal proceeding found that Mr. DaCorta committed wire fraud and mail fraud and is, therefore, precluded from arguing the elements of scienter and materiality and that the criminal trial proved that he made misrepresentations. (Doc. # 780 at pgs. 14, 25). However, in no part of the criminal trial was there proof that either DaCorta or the entity Oasis entered into contracts with other people for the purpose of the sale of a commodity or for making forex transactions or retail forex transactions on behalf of others. The district court omitted the requirement that any fraud or misrepresentation must have been in relation to a contract for the sale of a commodity. This was a material fact that was never demonstrated by the CFTC.

This legal distinction was never recognized by the district court: no agreement or contract or transaction to trade in currency was ever offered by DaCorta or Oasis or entered into with any person by DaCorta or Oasis. The Promissory Note and Risk Disclosures Agreement were legally distinct and materially different than offering a forex transaction or retail forex transaction to another person or entering into a foreign currency transaction with another person. The district court ignored the legal distinction between a loan program with a Promissory Note and offering or entering into a foreign currency transaction.

In fact, the district court's decision begins with the assumption that *"OIG 'solicited, received, and accepted funds' for foreign exchange ("forex") trading."* (Doc. 780 at pg. 3). As support for this proposition the district court cites to CFTC's motion for summary judgment (Doc. 749 ¶ 9) and to Mr. DaCorta's testimony at his criminal trial (Doc. 749-3 at 50:5-10). The cited materials do not support the district court's conclusion that either DaCorta or Oasis solicited funds for foreign exchange trading.

The district court cites to the CFTC's motion for summary judgment (Doc. 749 ¶ 9), which in turn cites to Ms. Robinson's declaration Exhibits H and I (Doc. 4-1; Doc. # 4-11; Doc. #4-12). Those exhibits to Robinson's declaration merely list expenses incurred by the Oasis entities; they do not assert or prove that DaCorta or Oasis solicited funds for forex transactions. Additionally, the trial court cites to Mr. DaCorta's trial testimony to support the contention that he solicited funds for forex trading. The excerpted testimony is as follows:

> *Q. What were the funds that would be loaned to OIG be used for?*
> *A. A percentage would be used for collateral deposit for foreign exchange trading, and the balance of it could be used for pretty much any investment decision we decided we would like to make.*
> (Doc. 749-3 at 50: 5-10)

The limited excerpt from DaCorta's testimony makes clear that the funds were borrowed. However, what both the district court and the CFTC omitted was the testimony that showed that the funds were borrowed pursuant to a loan program

and that Oasis never entered into forex transactions on behalf of the lenders. The entirety of the testimony was as follows:

> *Q Either way, were there documents that those investors had to agree*
> *to move forward with the 2017 loan program?*
> *A Yes, absolutely.*
> *Q What were the funds that would be loaned to OIG be used for?*
> *A A percentage would be used for collateral deposit for foreign*
> *exchange trading, and the balance of it could be used for pretty much*
> *any investment decision we decided we would like to make.*
> (Doc. 749-3 at 50: 2-10)

The documents referred to were the Promissory Note and the Risk Disclosure Agreement, which explained to the lenders that Oasis was not offering or entering into forex transactions on the lenders' behalf. (Doc. 750-1 Promissory Note, Loan Agreement and Risk Disclosures).

Whether the loaned money was a forex transaction and whether DaCorta and Oasis offered to or entered into foreign currency transactions with other persons is a genuine issue of material fact that was not proven by the cited materials in the district court's decision. Forex transaction and a retail forex transaction have very specific statutory definitions under 7 U.S.C. § 2(c)(2)(B) and 7 U.S.C. §2(c)(2)(C) that were never proven and no evidence supports the district court's decision.

_The Promissory Note and Risk Disclosure Agreement Renders The Transaction_
_Legally Distinct and Beyond the Reach of the CFTC Regulation_.

The agreements between DaCorta, Oasis and the lenders are legally distinct from contracts to enter into sales of commodities or for forex transactions or retail

forex transactions. This is a material fact in issue. The district court's reliance on the principal of collateral estoppel is misplaced because nowhere in the criminal proceedings was it ever proven that DaCorta or Oasis entered into contracts with other persons for the purpose of retail forex transactions.

*The District Court Erred When It Granted Summary Judgment In Favor Of The CFTC Under Count Two Of The Complaint As There Existed Genuine Issues Of Material Fact As To The Terms Commodity Pool Operator, Associated Person, Retail Forex Commodity Pool Operator, And Retail Forex Transactions.*

The CFTC alleged under count two of the complaint that Mr. DaCorta and the Oasis entities violated 7 U.S.C. §6o(1)(A)-(B), where they assert that **Mr. DaCorta and the Oasis entities, acting as commodity pool operators and associated persons of commodity pool operators,** solicited funds for the purpose of trading in commodities and that they pooled these investments while acting as associated persons of a retail forex commodity pool.

The district court decision in support of the holding that the Oasis entities solicited, received, and accepted funds for foreign exchange trading as commodity pool operators and associated persons of commodity pool operators cites to the sources listed in the statement of facts: the declaration of Ms. Robinson; declaration of Mr. Wiand; the criminal trial. None of those sources prove that DaCorta or Oasis acted as either commodity pool operators, associated persons, or that they engaged in forex trading on behalf of anyone.

The district court's analysis begins on page 3 (Doc. # 780 at 3) of its opinion where it states that OIG solicited, received, and accepted funds for foreign exchange. To support this finding, the district court cites to the CFTC motion for summary judgment (Doc #749 at ¶ 9) and Mr. DaCorta's testimony at his trial (Doc. #749-3 at 50:5-10). (Doc. 780 pg. 3). Neither of these sources support the contention that OIG or DaCorta or the Oasis entities solicited, received, and accepted funds for foreign exchange.

Paragraph nine of the CFTC's motion asserts that they did solicit funds for foreign exchange, citing to Ms. Robinson's declaration (Doc. #4-1 ¶¶ 56-64) and trial transcripts from Mr. DaCorta's criminal trial. Ms. Robinson's declaration at paragraphs 56 to 64 and Exhibits H and I (Doc. # 4-11; Doc. #4-12) are merely a list of deposits and withdrawals. The actual source of those deposits and withdrawals is not listed and how the funds were obtained is not stated. While Ms. Robinson has an extreme penchant for using the term "pool funds" and "Ponzi payments" to describe those funds, she does no analysis and cites no authority as to why she believes that these were pool funds and Ponzi payments. She merely adopts this language as a presumption without supporting evidence that there existed a commodity pool.

The district court also cites transcript from Mr. DaCorta's criminal trial to support the contention that funds were solicited for foreign exchange. (Doc. 749-3 at 50:5-10). That excerpt from the transcript says nothing about Mr. DaCorta

soliciting funds for foreign exchange and the district court's decision is based on faulty information.

Additionally, the CFTC at paragraph nine of its motion cites transcripts from day 10 of Mr. DaCorta's criminal trial. (Doc. #749-5 pgs. 248-255). The transcript at pgs. 248 to 255 says nothing about soliciting funds for foreign exchange. The CFTC's assertion (cited to by the district court) is wrong. The CFTC also cites to day 11 transcripts of the DaCorta criminal trial. (Doc. #749-3) The CFTC in paragraph nine cites to Doc. #749-3 pgs. 45-46, 50, 52, and 204 to support their assertion that DaCorta solicited funds for foreign exchange trading.

None of the transcripts cited supports the contention that Mr. DaCorta solicited funds for forex transactions. DaCorta's testimony is a description of the loan program that he instituted.

*The Loan Programs Are Legally Distinct From The Sale Of A Commodity On Behalf Of Another Person*.

Both the CFTC and the district court consistently skip over this essential legal distinction and fail to recognize that the loans made to Oasis are not the same as an investment in a commodity. The Promissory Notes and Risk Assessment Agreement were the basis for the loans made to Oasis. The lenders were promised repayment with interest. This loan transaction is legally distinct from a contract of sale for the purchase of a commodity on behalf of an investor. In the case of the loan agreement, the principle of the investor is protected by the promissory note and the legal

obligation to repay the principle with interest, despite the fluctuations of the market. The contract of sale for the purchase of a commodity on behalf of an investor is quite different in that the investor fully absorbs the risk of the fluctuations and instability of the market. (See Doc. # 750 at pg. 38 DaCorta Motion).

Both the CFTC's motion and the district court's decision fail to show any evidence that DaCorta or Oasis ever solicited funds from anyone for the purpose of entering into commodity sale agreements on behalf of other people, as is required under the statute (See 7 U.S.C. §6b(a)(2)).

*Commodity Pool And Count Two: There Is A Genuine Issue Of Material Fact Regarding The Existence Of A Commodity Pool*.

As part of the district court's decision under count one, the CFTC is obligated to prove that the Oasis entities constituted a commodity pool and that they were commodity pool operators. The CFTC failed to provide such evidence and the district court erred when it granted summary judgment.

In support of its decision to find that there existed commodity pools in this case, the district court makes four assertions: 1) investor's funds were aggregated into a single account; 2) funds were invested for the purpose of trading in commodity interests; 3) the lenders participation based on a promissory note system as opposed to direct investing does not effect whether Oasis should be classified as a commodity pool; 4) the Oasis entities are not qualified as Eligible Contract Participants (ECPs)

– meaning they are exempt from CFTC regulation – because the lenders, which the district court calls investors, are not ECPs. (Doc. 780 at pgs. 18-19).

*Count Two: The District Court Erred In Finding The Existence of a Commodity Pool Asserting That Investor Funds Were Aggregated Into A Single Account*

The district court asserts that the aggregation of investors' funds into a single account is an aspect of a commodity pool, citing to *Commodity Futures Trading Comm'n v. Amerman*, 645 F. App'x 938, 941-42 (11th Cir 2016). However, the facts of the *Amerman* case are distinguishable from this case because in *Amerman* the investors shared the profits and losses from commodity trading on a pro rata basis. In the case *sub judice*, the lenders did not share profits and losses but were promised repayment of a loan with interest.

The *Amerman* court held that while the aggregation of investors' funds into a single account is certainly one of the criteria for a commodity pool; however, the relevant feature of the pooling of such funds is to limit the liability of individual investors such that each investor shares the profits and losses on a pro rata basis. Conversely, Oasis did not pool funds to limit the liability of investors; Oasis issued promissory notes to repay the investors.

The district court's superficial recognition of the pooling of funds, once again, fails to perceive the distinction. The pooling of funds in a commodity pool is for the purpose of spreading risk and sharing in pro rata profits and losses. The Oasis lenders did not enter into a pool for the purpose of spreading risk and they did not share in

the pro rata distribution of profits and losses. The district court's reliance on the *Amerman* case is misplaced and it should not have granted summary judgment on count two.

*Count Two: The District Court Erred In Holding That A Commodity Pool Existed Asserting That Funds Were Invested For The Purpose Of Trading In Commodity Interests*.

The district court erred when it held that the "investor" funds were invested for the purpose of trading in commodities and, therefore, there existed a commodity pool. First, there were no investors; there were only lenders, each having signed a promissory note. Second, the lenders did not invest in commodities but were promised repayment of their principal plus interest **or transaction fees**. Principal and interest are two components of a loan repayment, not an investment in the sale of a commodity.

To support the holding that funds were invested for the purpose of trading in commodity interests, the district court cites to the CFTC motion for summary judgment (Doc. 749 at ¶¶ 9, 11); the trial testimony of Joseph Anile, the attorney for Oasis (Doc. 749-2 at 94:1-8); and DaCorta's trial testimony (Doc. 749-3 at 50:5-10). None of these sources supports the contention that funds were invested for the purpose of trading in commodity interests.

Paragraphs nine and eleven of the CFTC's motion, already discussed above, contain no relevant evidence that Oasis traded in commodities (forex exchange or retail forex exchange) on behalf of any of the lenders – again See 7 U.S.C. §6b(a)(2).

The district court also cites to the testimony of Joseph Anile at the criminal trial. This citation is deliberately deceptive because in that excerpt, Mr. Anile is discussing the state of Mr. DaCorta's company, Oasis, prior to 2012, which is prior to the time frame being discussed in this lawsuit and prior to any of the lenders or "investors" in question being involved with Oasis. Finally, the district court again cites to the same testimony of Mr. DaCorta, in which he never states that he was accepting funds for the purpose of trading in commodity interests on behalf of others. The district court's holding that *the record is clear that such funds were invested for trading in commodity interests* (Doc. #780 at 18) is false and summary judgment should not have been granted.

### *Count Two: The District Court Erred When It Asserted That Lenders Participation Based On A Promissory Note System As Opposed To Direct Investing Does Not Effect Whether Oasis Should Be Classified As A Commodity Pool.*

The district court erred when it held that the promissory note system does not effect the classification of Oasis as a commodity pool. To support this assertion, the district court cites to *Commodity Futures Trading Comm'n v. Collins*, No. 94 C 4375, 1997 WL 106135, at *2 (N.D. Ill. Feb. 10, 1997). (See Doc. 780 at 18).

However, the district court's reasoning is faulty as the Northern District never held that.

In *Collins*, the Northern District of Illinois found that the investors believed that they were investing in commodities but were told that the transactions were loans and that borrowers would share in the profits from the commodities transactions. See *Collins*, 1997 WL 106135 at 1. The facts of *Collins* are distinguishable in that the investors believed they were investing in commodities and sharing in profits from the trade in commodities. However, here, the lenders were loaning money with a contractual promise to receive re-payment.

*Count Two: The District Court Erred When It Held That The Oasis Entities Are Not Qualified As Eligible Contract Participants (ECPs) – Meaning They Are Exempt From CFTC Regulation – Because The Lenders, Which The District Court Calls Investors, Are Not ECPs Because That Holding Is Based Purely On The Fictionalized Existence Of Commodity Pools.*

The district court erroneously held that the Oasis entities and Mr. DaCorta are not Eligible Contract Participants under 7 U.S.C. §1a(18)(A)(iv)(II), which states that a *The term eligible contract participant means—(A) acting for its own account— (iv) a commodity pool that—(II) is formed and operated by a person subject to regulation under this chapter or a foreign person performing a similar role or function subject as such to foreign regulation (regardless of whether each investor in the commodity pool or the foreign person is itself an eligible contract participant) provided, however, that for purposes of section 2(c)(2)(B)(vi) of this title and section*

*2(c)(2)(C)(vii) of this title, the term "eligible contract participant" shall not include a commodity pool in which an participant is not otherwise an eligible contract participant.*

The district court's analysis assumes incorrectly two things: 1) that the Oasis entities and Mr. DaCorta were commodity pools; and 2) that the Oasis entities were not ECPs under 7 U.S.C. §1a(18)(A)(v)(III)(aa) and (bb), which states *The term eligible contract participant means—(A) acting for its own account—(v) a corporation, partnership, proprietorship, organization, trust, or other entity—(III) that – (aa) has a net worth exceeding $1,000,000; and (bb) enters into a an agreement, contract, or transaction in connection with the conduct of the entity's business or to manage the risk associated with an asset or liability owned or incurred or reasonable likely to be owned or incurred by the entity in the conduct of the entity's business.*

As has been previously discussed, neither the Oasis entities nor Mr. DaCorta acted as a commodity pool or a commodity pool operator. The lack of any evidence to the contrary means that there is a genuine issue of material fact with regard to the existence of a commodity pool. Additionally, the district court's limited analysis tortures the definition of Eligible Contract Participant by constricting it to one of the many possible definitions of Eligible Contract Participant. In this case, the district court's faulty assumption under §1a(18)(A)(iv) is that Oasis is a commodity pool

and that Mr. DaCorta is a commodity pool operator and that both are subject to regulation. Additionally, the district court does no analysis of any of the other means of becoming an Eligible Contract Participant under 7 U.S.C. §1a.

Mr. DaCorta asserted in his motions that OIG was an Eligible Contract Participant under the subsection cited above. (See Doc. #750 at ¶¶ 30-36). Thus, whether Oasis and Mr. DaCorta were Eligible Contract Participants and, therefore, exempt from regulation under a separate sub-section as they asserted was never addressed by the district court and there remains an undecided genuine issue of material fact, precluding the granting of summary judgment.

*Under Count Two, The District Court Erred When It Held That The Oasis Entities Were Commodity Pool Operators, Retail Forex Commodity Pool Operators, And That DaCorta Was An Associated Person Thereof.*

The district court erred when it held, under count two, that *there is no genuine dispute of material fact that both OIG and OM* (the Oasis entities) *were both CPOs and retail forex CPOs* (Doc. 780 at 30) and that *there is no genuine dispute of material fact that DaCorta was both an AP* (associated person) *of a CPO and an AP of a retail forex CPO*. (Doc. 780 at 30). The district court's reasoning, once again, was based on the unproven assertion that the Oasis entities operated commodity pools and that DaCorta solicited investment for the purpose of investing in commodities on behalf of others. Mr. DaCorta negated the assertion that there existed commodity pool operators or associated persons (Doc. #750 at ¶ 40 and pgs.

37-38 DaCorta motion) and it remains an outstanding issue of material fact precluding a finding of summary judgment.

In support of this contention, the district court cites to the CFTC's motion for summary judgment (Doc. #749 at ¶ 68), which merely states that DaCorta was responsible for all investment decisions, as well as managing a relationship with an outside broker, citing to the testimony of Joseph Anile at the criminal trial. Additionally, the district court cites Mr. DaCorta's trial testimony (Doc. 749-3 at 205:4-11, 206:8-15), which merely states that DaCorta managed a relationship with an outside broker and at one point changed brokers. The excerpts cited by the district court were a very limited window of information concerning one fraction of the activities of Mr. DaCorta. The information in no way proves that Mr. DaCorta ran a commodity pool, was a commodity pool operator or a retail forex commodity pool operator or an associated person of either such entity.

While the district court cites the statutory definition of commodity pool operator under 7 U.S.C. §1a(11)(A), which states that "*the term "commodity pool operator" means any person ---(i) engaged in a business that is of the nature of a commodity pool...*" and the regulatory definition of a retail forex commodity pool operator under 17 C.F.R. §5.1(d)(1), which states "*Commodity pool operator, for purposes of this part, means any person who operates or solicits funds, securities, or property for a pooled investment vehicle that is not an eligible contract*

*participant as defined in section 1a(18) of the Act, and that engages in retail forex transactions*," the district court's analysis is, once again, faulty and there remain issues of material fact that remain outstanding.

The district court merely states that DaCorta solicited funds on behalf of the Oasis entities as the definitive support for both of these contentions. (Doc.# 780 at 30-31). This does not prove that such pools existed as defined by statute or that Oasis was a commodity pool operator or retail forex commodity pool operator and that remains a genuine issue of material fact, precluding a finding of summary judgment.

*The District Court Erred When It Granted Summary Judgment On Count Three Because The Oasis Entities Were Not Commodity Pool Operators And Mr. DaCorta Was Not An Associated Person Of A Commodity Pool Operator*.

Under count three of the amendment complaint, the CFTC alleged violations of 7 U.S.C. §§ 2(c)(2)(C)(iii)(1)(cc), 6k(2), 6m(1), and 17 C.F.R. §5.3(a)(2), by failing to register as a CPO and retail forex CPO and Associated Person of a CPO and Associated Person of a retail forex CPO.

Each of the allegations require the existence of a commodity pool, that the Oasis entities were commodity pool operators and retail forex commodity pool operators, and that Mr. DaCorta was an associated person of a commodity pool operator or retail forex commodity pool operator, and that none were Eligible Contract Participants. The existence of any type of commodity pool or commodity pool operator remains an outstanding issue of material fact because the CFTC has

failed to put forth any evidence that Oasis and Mr. DaCorta offered to, or entered into any agreement contract or transaction in foreign currency with any of the lenders in this case. Thus, the requirement to register as such cannot be imposed.

Title 7 U.S.C. §2(c)(2)(C)(iii)(1)(cc) states: A person, unless registered in such capacity as the Commission by rule, regulation, or order shall determine and a member of a futures association registered under section 21 of this title, shall not-- **(cc)** operate or solicit funds, securities, or property for any pooled investment vehicle that is not an eligible contract participant in connection with agreements, contracts, or transactions described in clause (i) of this subparagraph entered into with or to be entered into with a person who is not described in item (aa), (bb), (ee), or (ff) of subparagraph (B)(i)(II). Relevant to this section is 7 U.S.C. §2(c)(2)(C)(i)(I), which states that §2 (c)(2)(C)(iii)(1)(cc) is applicable to any agreement, contract, or transaction in foreign currency that is—(aa) offered to, or entered into with, a person that is not an eligible contract participant.

Neither DaCorta nor the Oasis entities ever *entered into* a contract or transaction in foreign currency with any of the lenders in this case and neither was such a contract for the sale in foreign currency *offered to* them. None of the lenders ever entered into any contract for the sale or the purchase of a commodity and DaCorta and Oasis never contracted to purchase commodities on their behalf.

Each of the statutes and regulations cited by the district court require that in order to violate said statute, one must be acting as a commodity pool operator and soliciting funds for participation in a commodity pool. No such evidence was offered by the CFTC or cited to by the district court. Whether the Oasis entities were commodity pool operators and whether DaCorta was an associated person both remain outstanding issues of material fact.

The district court erroneously held that there was no genuine dispute of material fact that the Oasis entities were CPOs and retail forex CPOs or that DaCorta was an associated person of those CPOs. (Doc. #780 at 32). The district court makes no citations to any additional factual support for this conclusion. As previously stated, the district court's flawed assessment of the existence of commodity pools and commodity pool operators is based on the unsound opinions of Ms. Robinson, Ms. Davis, and Mr. Wiand. None of these declarations/statements relied upon by the CFTC and the district court contain a sound analysis of the statutes involved here or of the facts of this case. The declarations begin with the assumption that there exist commodity pools and commodity pool operators without explanation or analysis. Those faulty assertions were relied upon by the district court.

*The District Court Erred When It Granted Summary Under Counts Four And Five Of The Amended Complaint As Oasis And DaCorta Never Received Pool Funds And Never Commingled Funds Regarding Pools That Never Existed*.

Under count four, the CFTC alleged that Mr. DaCorta and the Oasis entities violated regulation 17 C.F.R. §4.20(b)-(c) (2018) in that Mr. DaCorta and the Oasis entities, acting as commodity pool operators and associated persons of commodity pool operators received funds from pool participants, did not receive the funds in the name of the pool, and commingled the Oasis pool property with the property of other persons.

The district court granted summary judgment (Doc. #780 at 33), citing to Ms. Robinson's declaration (Doc. #4-1 at ¶ 30, 44, 45); the CFTC's motion (Doc. 749 at ¶ 50); Mr. Anile's testimony (Doc. #749-2 at 153:5-157:13); and Mr. DaCorta's motion (Doc. 757 at ¶50).

Ms. Robinson's declaration (Doc. #4-1 at ¶ 30, 44, 45) is, again, an accounting of funds going in and out of accounts without any analysis as to whether the accounts were "pooled funds" and whether the activity by Oasis subjected them to regulation by the CFTC. The district court's reliance on that declaration is faulty in that it does not prove the existence of pooled funds.

The district court also cited to the CFTC's motion (Doc. 749 at ¶ 50) where the CFTC asserted that Mr. DaCorta paid for a personal residence with Oasis funds. This was a misrepresentation to the court because DaCorta did not own the home but purchased it as an investment for Oasis and intended to flip the house for the company's profit. Thus, the CFTC's representation that DaCorta paid for two

personal residences is false. The investments in real estate were consistent with the loan agreement signed with each of the lenders. They were made aware, *ab initio*, that Oasis would invest in real estate. (Doc. # 750-1 at pg. 4 ). The Agreement and Risk Disclosures statement signed by each of the lenders permitted Oasis to use funds for various investments, including real estate. (Doc. #750-1 at pg. 4).

Furthermore, the CFTC citing to Mr. DaCorta's testimony mentions that he took a trip on a private plane; however, the CFTC leaves out the fact that Mr. DaCorta testified that the majority of the time he flew coach; the district court fails to mention that Mr. DaCorta testified that he rarely went on vacation (about 2.5 days per year over the last ten years See Doc. 749-3 at 125). The CFTC makes grandi60-8267ose representations of a luxurious lifestyle that are untrue and inexistent. The district court's reliance on these assertions is a failure to look at all the facts.

## Count Five

Under count five, the CFTC alleged a violation of 17 C.F.R. §4.21 (2018), stating that Mr. DaCorta and the Oasis entities, acting as commodity pool operators and associated persons of commodity pool operators failed to provide pool disclosures. It was again alleged that Mr. DaCorta and the Oasis entities operated as commodity pool operators relating to forex transactions and that they were required to register as commodity pool operators and failed to deliver to pool participants a disclosure document.

Here again, the requirement to deliver such disclosures is dependent upon the finding that there existed commodity pools, that Oasis acted as a commodity pool operator, and that DaCorta was an associated person thereof, and that trades were not executed by an Eligible Contract Participant. No such evidence exists, precluding a finding of summary judgment.

## CONCLUSION

The district court's decision granting summary judgment must be vacated and the consequent remedies imposed by the district court must be reversed and vacated as well, including the injunctive relief, restitution, and civil penalty.

Dated: June 25, 2024

/s/ Stephen N. Preziosi

Stephen N. Preziosi, Esq.

48 Wall Street, 11th Floor

New York, New York 10005

212-960-8267

## CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMIT

1.      This brief complies with the type-volume limit of Fed. R. App. P. 32(a)(7)(B) because, excluding the parts of the brief exempted by Fed. R. App. P. 32(f), this document contained 12,938 words.

2.      This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this document has been prepared in proportionally spaced typeface using Microsoft Word in Times New Roman typeface and 14-point font size.

/s/ Stephen N. Preziosi

_____

Stephen N. Preziosi, Esq.
*Attorney for Appellant*

Dated: June 25, 2024