Case No. 24-10132

# In The United States Court Of Appeals For The Eleventh Circuit

———————————

U.S. COMMODITY FUTURES TRADING COMMISSION,

Plaintiff-Appellee,

v.

OASIS INTERNATIONAL GROUP, LIMITED, ET. AL.,

Defendants,

MICHAEL J. DACORTA,

Defendant-Appellant.

———————————

Appeal from the U.S. District Court for the
Middle District of Florida
Case No. 8:19-cv-00886-VMC-SPF (Hon. Virginia Hernandez Covington)

———————————

## BRIEF OF APPELLEE
## THE U.S. COMMODITY FUTURES TRADING COMMISSION

———————————

Robert A. Schwartz
  *General Counsel*
Anne W. Stukes
  *Deputy General Counsel*
Margaret P. Aisenbrey
  *Assistant General Counsel*
U.S. Commodity Futures
  Trading Commission
2600 GRAND BLVD STE 210
KANSAS CITY, MO 64113
(816) 960-7700

## CERTIFICATE OF INTERESTED PERSONS AND
## CORPORATE DISCLOSURE STATEMENT

Pursuant to Eleventh Circuit Rule 26.1, undersigned counsel for the Commodity Futures Trading Commission ("CFTC" or "Commission"), hereby submits this Certificate of Interested Persons and Corporate Disclosure Statement. The CFTC is an agency of the United States government and has no parent corporation, nor does any publicly held corporation have an ownership interest in the CFTC. Persons/entities that undersigned counsel believes, in good faith, have an interest in the outcome of this appeal are:

1.　444 Gulf of Mexico Drive, LLC – Relief Defendant (not publicly traded, not an appellant)

2.　4064 Founders Club Drive, LLC – Relief Defendant (not publicly traded, not an appellant)

3.　6922 Lacantera Circle, LLC – Relief Defendant (not publicly traded, not an appellant)

4.　13318 Lost Key Place. LLC – Relief Defendant (not publicly traded, not an appellant)

5.　4Oaks, LLC – Relief Defendant (not publicly traded, not an appellant)

6.      Margaret Aisenbrey – Counsel for CFTC

7.      Joseph S. Anile, II  – Defendant (not an appellant)

8.      Scott S. Allen, Jr. -- Counsel for Mainstream Fund Services Inc –

Relief Defendant (not publicly traded, not an appellant)

9.      J. Alison Auxter – Counsel for CFTC

10.     Bowling Green Capital Management, LLC Relief Defendant (not

publicly traded, not an appellant)

11.     David W.A. Chee – Counsel for United States (Middle District of

Florida)

12.     The Hon. Virginia M. Hernandez Covington – U.S. District Court

Judge

13.     Ailen Cruz – Counsel for Court-Appointed Receiver

14.     Michael J. DaCorta  – Defendant-Appellant

15.     Rachelle DesVaux Bedke – Counsel for United States (Middle

District of Florida)

16.     Lawrence Joseph Dougherty – Counsel for Court-Appointed Receiver

17.     Francisco L. Duran – Defendant (not an appellant)

18.     Chemere Ellis – Counsel for Court-Appointed Receiver

19.     Eric Ryan Feld – Counsel for Court-Appointed Receiver

20.     The Hon. Sean P. Flynn – U.S. Magistrate Judge

21.    Guerra & Partners, PA – Counsel for Court-Appointed Receiver

22.    John J. Haas – Defendant (not an appellant)

23.    Gregory P. Holder – Court-Appointed Mediator

24.    Johnson Pope Bokor Ruppel & Burns, LLP  – Counsel for Court-Appointed Receiver

25.    Ronald James Kurpiers, II – Counsel for Defendant Michael DaCorta in district court case, but not retained for appeal

26.    Kurpiers Law Firm, PA – Counsel for Defendant Michael DaCorta in district court case, but not retained for appeal

27.    Lagoon Investments, Inc. – Relief Defendant (not publicly traded, not an appellant)

28.    Law Office of Burton W. Wiand, PA – Court-Appointed Receiver

29.    Jeffery Le Riche – Counsel for CFTC

30.    Lippes Mathias LLP – Counsel for Mainstream Fund Services Inc – Relief Defendant (not publicly traded, not an appellant)

31.    Maya Lockwood – Counsel for Court-Appointed Receiver

32.    Mainstream Fund Services Inc – Relief Defendant (not publicly traded, not an appellant)

33.    Beatriz McConnell – Counsel for Court-Appointed Receiver

34.    Raymond P. Montie, III  – Defendant (not an appellant)

35.    Oasis International Group Limited – Defendant (not publicly traded, not an appellant)

36.    Oasis Management, LLC  – Defendant (not publicly traded, not an appellant)

37.    Jared J. Perez – Counsel for Court-Appointed Receiver

38.    Jared J. Perez, PA – Counsel for Court-Appointed Receiver

39.    Roar of the Lion Fitness LLC –  Relief Defendant (not publicly traded, not an appellant)

40.    James D. Sallah – Counsel Retained by Court-Appointed Receiver

41.    Sallah Astarita & Cox, LLC – Counsel Retained by Court-Appointed Receiver

42.    Satellite Holdings Company  – Defendant (not publicly traded, not an appellant)

43.    Anne Stukes – Counsel for CFTC

44.    Robert Schwartz – Counsel for the CFTC

45.    Dennis C. Vacco – Counsel for Mainstream Fund Services Inc – Relief Defendant (not publicly traded, not an appellant)

46.    Christopher A. Walker -- Counsel for Mainstream Fund Services Inc – Relief Defendant (not publicly traded, not an appellant)

47.    Burton W. Wiand – Court-Appointed Receiver

48.     Zinober Diana and Monteverde PA – Court-Appointed Mediator


Dated: August 28, 2024                    /s/ Margaret Aisenbrey
                                          Margaret Aisenbrey
                                          Counsel for Appellee
                                          Commodity Futures Trading
                                          Commission

## STATEMENT REGARDING ORAL ARGUMENT

The CFTC respectfully submits that oral argument is not needed in this case because the facts and legal issues are adequately presented in the briefs and record.

# TABLE OF CONTENTS

JURISDICTIONAL STATEMENT ........................................................................... 1

STATEMENT OF THE ISSUES................................................................................ 3

STATEMENT OF THE CASE.................................................................................. 4

    A.  Introduction to the CFTC and the Statutory Framework of the Commodity Exchange Act 4

    B.  Introduction to this Case ........................................................................ 7

STANDARD OF REVIEW ..................................................................................... 14

SUMMARY OF ARGUMENT ............................................................................... 15

ARGUMENT .......................................................................................................... 16

    I.   The District Court's Grant of Summary Judgment to the CFTC on Section 4b Was Appropriate ..................................................................... 16

        A.  This Court Should Not Entertain DaCorta's Waived and Baseless Argument that the Relevant Forex Transactions Were Not "For or On Behalf Of" His Victims ................... 17

        B.  The Antifraud Section 4b Reaches DaCorta's Conduct Under His Own Theory ...... 20

            1.  DaCorta's Solicitations Are Sufficient to Demonstrate that He Was Soliciting to Trade "For or On Behalf Of" Others................................................................................. 23

            2.  DaCorta's Promissory Note Scheme Does Not Sever the Agency-Like Relationship He Had with His Victims ................................................................................. 25

            3.  The Misrepresentations were "In Connection With" Forex Trading...................... 27

    II.  The Existence of a Promissory Note Scheme Does Not Convert a Commodity Pool into Something Else.................................................................. 28

        A.  The Text of the Statute Does Not Require Pro Rata Distribution ............................. 29

        B.  The District Court Properly Found the Funds Were for the Purpose of Trading in Commodity Interests. ................................................................................. 32

        C.  The Fact that the Oasis Entities Were Commodity Pools Precludes DaCorta's Arguments on Counts III, IV, and V.................................................................. 36

    III.  The District Court Properly Determined the Oasis Entities and DaCorta Were Not Eligible Contract Participants ............................................................... 37

CONCLUSION....................................................................................................... 39

## TABLE OF AUTHORITIES

**Cases**

*Access Now, Inc. v. Sw. Airlines Co.*,

   385 F.3d 1324, 1331 (11th Cir. 2004)...................................................................... 15, 20

*Ashley v. Jaipersaud*,

   544 F. App'x 827 (11th Cir. 2013) ...................................................................... 18

*C.F.T.C. v. Gresham,*

   No. 3:09-CV-75, 2011 WL 8249266,  at *7 (N.D. Ga. Sept. 8, 2011) ................................... 26

*CFTC v. Equity Financial Group, LLC*,

   572 F.3d 150, 157 (3d Cir. 2009)...................................................................... 22, 24

*CFTC v. JBW Capital, LLC*,

   812 F.3d 98, 109 (1st Cir. 2016)...................................................................... 21, 24, 27

*CFTC v. Levy*,

   541 F.3d 1102, 1110 (11th Cir. 2008)...................................................................... 14

*CFTC v. R.J. Fitzgerald*,

   310 F.3d 1321, 1329 (11th Cir. 2002)...................................................................... 18, 20, 22

*CFTC v. Vartuli*,

   228 F.3d 94, 102 (2d Cir. 2000)...................................................................... 22, 24, 27

*Commodity Futures Trading Comm'n v. Amerman*,

   645 F. App'x 938, 941-42 (11th Cir 2016) ...................................................................... passim

*Commodity Trend Serv. v. CFTC*,

   233 F.3d 981, 992 (7th Cir. 2000)...................................................................... 23

*Dixson v. United States,*

   465 U.S. 482 (1984)...................................................................... 25

*Federal Deposit Ins. Corp. v. 232, Inc.*,

   920 F.2d 815, 817 (11th Cir.1991)...................................................................... 18

*Fuentes v. Classica Cruise Operator Ltd*,

   32 F.4th 1311, 1315 (11th Cir. 2022) ...................................................................... 14

*Hammond v. Smith Barney Harris Upham & Co.*,

   CFTC No. 86-R131, 1990 WL 282810, at n.16 (CFTC Mar. 1, 1990) ...................................................................... 23

*Hirk v. Agri-Research Council, Inc.*,

   561 F.2d 96, 103-04 (7th Cir. 1977) ...................................................................... 21

*Irving v. Mazda Motor Corp.*,

    136 F.3d 764, 769 (11th Cir.1998)..................................................................... 19

*R&W Technical Servs., Ltd. v. CFTC*,

    205 F.3d 165, 173 (5th Cir. 2000)........................................................21, 26, 31

*Reese v. Herbert*,

    527 F.3d 1253, 1268 (11th Cir. 2008)............................................................... 39

*Saxe v. E.F. Hutton & Co.*,

    789 F.2d 105, 110-11 (2d Cir. 1986) ................................................................ 21

*SEC v. Rand*,

    805 F. App'x 871, 875 (11th Cir. 2020) ........................................................... 17

*Smith v. Lanz*,

    321 F.3d 680, 683 (7th Cir. 2003).................................................................... 39

*United States v. DaCorta*,

    2024 WL 1905330, at *2 (11th Cir. May 1, 2024) ........................................... 18

*United States v. Wilkinson*,

    986 F.3d 740, 744 (7th Cir. 2021).............................................................. 34, 35

**Statutes, Rules and Regulations**

7 U.S.C. § 2(c)(2)(C)(iii)(I)(cc) ........................................................................... 7

§ 5.13 ...................................................................................................................... 6

§ 5.14 ...................................................................................................................... 6

§ 5.6-5.7 ................................................................................................................. 5

17 C.F.R. § 4.10(d)(3)......................................................................................... 31

17 C.F.R. § 4.22(e)(2) ......................................................................................... 31

17 C.F.R. § 5.2 ......................................................................................... 6, 16, 27

17 C.F.R. § 5.3 .................................................................................................. 5, 7

17 C.F.R. §§ 1.3, 5.1(d)(2)................................................................................. 37

17 C.F.R. §§ 4.20-4.27 ......................................................................................... 6

28 U.S.C. § 1291..................................................................................................... 1

28 U.S.C. § 1331..................................................................................................... 1

28 U.S.C. § 1345..................................................................................................... 1

7 U.S.C. § 1(A)(18)(A)(v)(III)........................................................................... 38

7 U.S.C. § 1(A)(18)(A)(xi) ................................................................................. 37

7 U.S.C. § 1-26 ....................................................................................................... 1

7 U.S.C. § 13a-1 ........................................................................................................... 1

7 U.S.C. § 13a-1(d)(3)(A)) ......................................................................................... 15

7 U.S.C. § 1a ................................................................................................................. 4

7 U.S.C. § 1a(10) ........................................................................................................ 30

7 U.S.C. § 1a(11) ........................................................................................................ 29

7 U.S.C. § 1a(18)(A)(iv)(II) ....................................................................................... 13

7 U.S.C. § 2(c)(2)(C)(i)(I)(bb) ..................................................................................... 4

7 U.S.C. § 5 ................................................................................................................... 4

7 U.S.C. § 5(b) ............................................................................................................ 21

7 U.S.C. § 6b .................................................................................................. 3, 6, 16, 27

7 U.S.C. § 6m(1) ........................................................................................................... 7

7 U.S.C. § 6o ................................................................................................................. 6

7 U.S.C. 1a(18) ............................................................................................................. 3

7 U.S.C. 6k(2) ............................................................................................................... 7

7 USC § 1a(18) ............................................................................................................. 5

Fed. R. App. P. 4(a)(1)(B)(ii) ...................................................................................... 1

## JURISDICTIONAL STATEMENT

(A)     In this civil-enforcement action brought by the Commodity Futures

Trading Commission ("CFTC" or the "Commission"), the district court had

jurisdiction under 28 U.S.C. § 1331 (federal question) and 28 U.S.C. § 1345

(federal agency authorized to sue as plaintiff) because 7 U.S.C. § 13a-1

authorizes district courts to enforce compliance with the Commodity

Exchange Act, 7 U.S.C. § 1-26, and the CFTC's regulations.

(B)     This Court has jurisdiction under 28 U.S.C. § 1291 because the

district court's judgment (Appendix X at 275-77 (ECF No. 781)) was a final,

appealable order.

(C)     The final judgment was entered on December 7, 2023. (Appendix X at

275-77 (ECF No. 781)).  Because the CFTC is an agency of the United

States, the appeal period was sixty days under Fed. R. App. P. 4(a)(1)(B)(ii).

No party filed a motion that tolled the time within which to appeal.

Appellant timely filed his notice of appeal within the appeal period on

December 29, 2023 pursuant to the prison mailbox rule, which was docketed

on January 5, 2024. (Appendix X at 280-81 (ECF No. 795)).

(D)     The appeal is from a final judgment that disposed of all claims against

DaCorta.  The CFTC's Amended Complaint contained five counts against

each of the five individual and three corporate defendants. (Appendix I at

1

143-199 (ECF No. 110.)) All Defendants besides DaCorta settled.

(Appendix I at 97-98, showing docket entries 786, 787, 788, 789, 790).  The

summary judgment motion and settlements left nothing for disposition in the

district court on the issues of liability, equitable relief, or damages between

the parties besides determination of costs, execution of the judgment, and

finalization of the receivership estate, and any required adjudication of

claims involving the receivership, including distributions to victims.

## STATEMENT OF THE ISSUES

This is an appeal in a federal agency civil-enforcement action.  Appellant Michael DaCorta appeals the District Court's grant of summary judgment for the CFTC and against Defendant DaCorta on all counts. (Appendix X at 228-73 (ECF No. 780)).  The issues on appeal are:

1. Whether DaCorta waived any argument regarding the text of an antifraud provision in the Commodity Exchange Act, 7 U.S.C. § 6b, and if not, whether the existence of a promissory note scheme affects the statute's applicability to DaCorta's fraud.

2. Whether the district court erred in determining that DaCorta's promissory note scheme did not negate or affect the existence of a commodity pool.

3. Whether the relevant commodity pools are not subject to CFTC regulation because they were eligible contract participants, as defined in 7 U.S.C. 1a(18).

**STATEMENT OF THE CASE**

**A. Introduction to the CFTC and the Statutory Framework of the Commodity Exchange Act**

The CFTC is a federal governmental agency that exists to protect the public interests from fraudulent or abusive sales practices and misuses of customer assets as they relate to the financial "derivatives" markets. 7 U.S.C. § 5. "Derivatives" are financial instruments that derive their value from something else, like a benchmark or a physical commodity. Derivatives include instruments commonly known as futures contracts, swaps, and retail forex transactions. Such instruments are referred to as "commodity interests." 7 U.S.C. § 1a.

Pertinent here, the Commodity Exchange Act (CEA or the Act) gives the CFTC authority over retail "forex" transactions as a commodity interest. Retail forex transactions are described in the CEA as "any agreement, contract, or transaction in foreign currency" that is offered to or entered into with a person who is not an "eligible contract participant" and is "offered, or entered into, on a leveraged or margined basis, or financed by the offeror, the counterparty, or a person acting in concert with the offeror or counterparty on a similar basis." 7 U.S.C. § 2(c)(2)(C)(i)(I)(bb). In layman's terms, retail forex transactions involve trading one foreign currency for another currency, using leverage or margin, for

4

the purpose of "hedging"[1] or profiting from that trade.  So-called "retail" forex

transactions are distinct from transactions with "eligible contract participants,"

defined in the Act at 7 USC § 1a(18), who are generally very high net worth

individuals or entities, such as financial institutions, insurance companies, or

commodity pools, that are classified by the Commodity Exchange Act as eligible

contract participants based upon their regulated status or the amount they invest on

a discretionary basis.  This classification permits eligible contract participants

("ECPs") to engage in specific transactions (such as trading on a swap execution

facility or entering into a bilateral swap trade) not directly available to non-eligible

contract participants, i.e., retail customers.  CFTC, *Glossary: A Guide to the

Language of the Futures Industry*, "Eligible Contract Participant" *available at*

https://www.cftc.gov/LearnAndProtect/AdvisoriesAndArticles/CFTCGlossary/ind

ex.htm (last visited Aug 26, 2024).

Persons or entities who offer retail forex transactions are bound by certain

requirements in the CFTC's regulations, such as registering with the CFTC, 17

C.F.R. § 5.3, providing customers with mandatory risk disclosures, *id.* § 5.4,

maintaining certain financial reserves, *id.* §§ 5.6-5.7, maintaining certain business

---

[1] "Hedging" means to enter into a position in a derivatives market to minimize the risk of financial loss from an adverse price change in the cash market.  *See* CFTC *Glossary: A Guide to the Language of the Futures Industry*, "Hedger" *available at* https://www.cftc.gov/LearnAndProtect/AdvisoriesAndArticles/CFTCGlossary/ind ex.htm#H (last visited Aug. 26, 2024).

records, *id.* § 5.14, providing customer statements, *id.* § 5.13, and above all, not cheating or defrauding their customers, *id.* § 5.2.

Any entity or individual who offers retail forex trading as a means for customers to "pool" their positions with those of others is required to register with the CFTC as a "commodity pool operator," or an "associated person" of same, and must abide by regulations in 17 C.F.R. §§ 4.20-4.27. These sections of the CFTC's regulations require certain operational, recordkeeping, and customer disclosure practices for commodity pools, such as prohibiting commingling of funds, *id.* § 4.20, issuing account statements to customers, *id.* § 4.22, and giving customers certain mandatory disclosures as to risk and the performance of the pool, *id.* §§ 4.21, 4.24-4.25. Commodity pool operators ("CPOs") and their associated persons ("APs") are forbidden by statute from defrauding their customers. *See* CEA Section 4*o*, 7 U.S.C. § 6*o*.

Indeed, the CEA prohibits fraud throughout the commodity markets. The CEA has certain antifraud provisions that apply regardless of registration requirements (as relevant here, Section 4b of the Act, 7 U.S.C. § 6b), provisions that only apply to certain categories of persons who fall within a registration category (as relevant here, Section 4*o* of the Act, 7 U.S.C. § 6*o*), and antifraud provisions that apply in connection with a certain type of transaction (as relevant here, Regulation 5.2, 17 C.F.R. § 5.2).

In addition to prohibiting fraud, the CEA also imposes registration requirements for the operators of Commodity Pools, in Section 4m(1) of the CEA, 7 U.S.C. § 6m(1) and the APs of CPOs in Section 4k(2), 7 U.S.C. 6k(2).  CPOs and APs of CPOs that operate in connection with retail forex transactions are required to be registered under Section 2(c)(2)(C)(iii)(I)(cc) of the Act, 7 U.S.C. § 2(c)(2)(C)(iii)(I)(cc) and Regulation 5.3, 17 C.F.R. § 5.3.

## B. Introduction to this Case

Between mid-April 2014 and when the CFTC sued in April 2019 (the "Relevant Period"), Defendant Michael DaCorta and two of his companies, Oasis International Group, Limited, and Oasis Management, LLC, had solicited, received, and accepted funds—over $75,000,000—for forex trading.  Appendix X at 230, 233, 235 (ECF No. 780).  At the same time, only $22,000,000 was used for forex trading, while DaCorta and his codefendants misappropriated over $28,000,000.  Appendix X at 236 (ECF No. 780).  DaCorta was responsible for all forex trading, but he was not ultimately successful, losing a total of $62,000,000, including fees and costs.  Appendix X at 234 (ECF 780).  More than 700 U.S. persons sent their money to DaCorta and his entities, but none of them heard about DaCorta's losses because DaCorta directed that his victims be sent statements that concealed the losses.  Appendix X at 229, 234 (ECF No. 780).  Instead, the victims learned that all their money was gone when the CFTC filed this matter.

The CFTC filed this matter against Defendants Oasis International Group, Limited, Oasis Management, LLC, (collectively "Oasis Entities"), Satellite Holdings Company, Michael J. DaCorta, Joseph S. Anile, II, Raymond P. Montie, III, Francisco L. Duran, and John J. Haas on April 15, 2019. Appendix X at 229 (ECF No. 780). The complaint alleged that the Defendants had engaged in a fraudulent scheme to solicit and misappropriate money from over 700 U.S. residents for pooled investments in connection with retail forex transactions. Appendix X at 229 (ECF No. 780). The CFTC alleged that the Oasis Entities had operated two commodity pools (Oasis Global FX, Limited and Oasis Global FX, SA (collectively, the "Oasis Pools")), which made the Oasis Entities unregistered commodity pool operators (CPOs) and Defendant DaCorta was an associated person (AP) of the unregistered commodity pool operators. Appendix I at 185-191 (ECF No. 111).

The CFTC charged all the defendants with fraud. Appendix I at 181-187 (ECF No. 111). The CFTC charged fraud in connection with forex transactions (Count I), fraud by a CPO or an AP of a CPO (Count II), as well as failure to register as a CPO or an AP of a CPO (Count III), the failure to receive funds in the pools' names and the commingling of pool funds (Count IV), and the failure to provide pool disclosures (Count V). Appendix I at 143-198 (ECF No. 111). The

8

District Court issued a restraining order and appointed a Receiver, and thereafter issued a preliminary injunction.  Appendix X at 229 (ECF No. 780).

Defendants DaCorta and Joseph Anile were also indicted for their role in the fraudulent schemes.  Appendix IX at 74 (ECF No. 749-11).  Anile pleaded guilty and testified at DaCorta's criminal trial, and DaCorta was convicted after a thirteen-day jury trial on conspiracy to commit wire fraud and mail fraud, money laundering, and making a false and fraudulent statement on an income tax return. Appendix X at 237 (ECF No. 780); Appendix IX at 9 (ECF No. 749-9).   The criminal trial established that the victims in this case lost at least $53 million, and DaCorta personally obtained and dissipated at least $2.8 million in proceeds. Appendix X at 238 (ECF No. 780).

After civil discovery, the CFTC moved for summary judgment against DaCorta on all counts,[2] arguing for collateral estoppel against DaCorta for all issues determined by the criminal trial and using the testimony in the criminal trial, including DaCorta's own testimony, summaries offered by a CFTC investigator, the declaration of the court-appointed Receiver, and a CPA report offered by the Receiver.[3]  Appendix II at 158-168 (ECF No. 749).  DaCorta cross-moved for

---

[2] All other defendants in this matter settled by stipulating to violations of the CEA and/or CFTC Regulations.  Appendix I at 97-98, showing docket entries 786, 787, 788, 789, 790.

[3] In this appeal, DaCorta makes repeated insinuations that the CFTC's investigator summaries are somehow insufficient.  For one thing, he argues that the CFTC

summary judgment arguing that the Oasis Entities were not a Ponzi scheme because they remained solvent and that the Oasis Entities did not operate Commodity Pools.  Appendix IV at 132-140 (ECF No. 750).  Notably, DaCorta made no argument based on the text of Section 4b.  The CFTC raised concerns with the nature of DaCorta's motion and its lack of citation to pinpoint evidence, and while the District Court "agree[d] with the CFTC's assessment," it briefly addressed DaCorta's arguments.  Appendix X at 242-43, (ECF No. 780).[4]

The District Court found that DaCorta engaged in fraud.  The District Court found over 800 participants invested more than $75 million in the Oasis Entities,

---

investigator was never cross-examined by his defense counsel.  Defense counsel had the benefit of civil discovery in this matter and did not pursue the CFTC's investigator's deposition, though he did take other depositions.  Thus, DaCorta is complaining about his own error.  He also complains that the declaration summarizes certain phone calls but does not attach a transcript.  The transcripts of the calls were filed with the Court years before the summary judgment motion, at least some of the underlying recordings were in evidence in the criminal trial, and the transcripts were also attached to the summary judgment motion.  Those transcripts are found at Appendix II at 9-57.  Finally, the CFTC notes that DaCorta failed to meaningfully dispute any of the evidence offered by the CFTC regarding the investigator summaries, and he only objected to those facts insofar as they included the terms "pool participants."  Appendix X at 242 (ECF No. 780) (District Court order noting DaCorta failed to follow Rule 56.1), 245 (ECF. No. 780) (District Court order noting that the only objection DaCorta raised on specific facts were the CFTC's terminology).  Given DaCorta's complete failure to raise any of these issues in the District Court or contest any of the underlying facts in the summary judgment motions, the CFTC will not further engage with these insinuations.

[4] DaCorta had the benefit of counsel for the summary judgment briefing.  *See* Appendix I at 94-95 (Docket entries showing counsel filed the relevant briefs).

only $22 million was used for forex trading, while DaCorta and other defendants misappropriated over $28 million.  Appendix X at 235-36 (ECF No. 780).  The District Court also found that the retail forex trading was not profitable, as the Oasis Entities had net trading losses of over $20 million.  Appendix X at 235-36 (ECF No. 780).  In summary judgment briefing, DaCorta admitted that he was responsible for all investment decisions and trading execution and was aware of the trading losses.  Appendix X at 233, 236 (ECF No. 780).  DaCorta does not challenge any of these factual determinations on appeal.

The District Court determined that DaCorta did not contest any of the CFTC's facts that he had made misrepresentations.  Appendix X at 253 (ECF No. 780).  Those misrepresentations included that participants' deposits would be used in forex trading,[5] participants were guaranteed to earn a minimum of 12%

_____

[5] The district court found that DaCorta had not denied the CFTC's underlying facts, which pointed to evidence that he had told some investors funds would be used to trade forex.  The CFTC's underlying facts on the representations that *all* funding would go to forex trading would have been stronger with additional citations to the record. Supp. Appendix I at 102, 104 (ECF No. 165-16 at 5).  While DaCorta did not tell all his victims this particular misrepresentation as evidenced in this argument before this Court, his codefendants made this misrepresentation repeatedly, and DaCorta is liable for their misrepresentations based on his status as a control person of the Oasis Entities.  *See* Supp. Appendix Vol III at 114 (ECF No. 786 at ¶ 19) (Consent Order of Joseph Anile admitting to this misrepresentation); *see also* Supp. Appendix III at 150 (ECF No. 787 at ¶ 21) (Consent Order of entered against Defendant Duran without admitting or denying this misrepresentation); Supp. Appendix III at 184 (ECF No. 788 at ¶ 21) (Haas Consent Order).

annually, Defendants' forex trading had been profitable, no trading risk existed other than systematic risk, and participants would receive referral fees when they introduced additional participants.  Appendix X at 253 (ECF No. 780).  The Court also found that DaCorta omitted to tell victims of the fraudulent scheme that only some of the participant funds were used in forex trading, the pools suffered net losses, payments to participants were drawn from funds contributed by other participants, and some funding was misappropriated to fund DaCorta's lifestyle.  Appendix X at 254 (ECF No. 780).  The Court further found DaCorta also did not inform participants that he had previously been barred by the NFA[6] from trading in a way requiring registration and that neither he nor the Oasis Entities were registered with the CFTC, retained appropriate records, nor had the ability to return participants' principal.  Appendix X at 254 (ECF No. 780).  Finally, the District

---

[6] National Futures Association (NFA): A self-regulatory organization whose members include futures commission merchants, commodity pool operators, commodity trading advisors, introducing brokers, designated contract markets, swap execution facilities, commercial firms, and banks, that is responsible—under CFTC oversight—for certain aspects of the regulation of FCMs, CPOs, CTAs, IBs, and their associated persons, focusing primarily on the qualifications and proficiency, financial condition, retail sales practices, and business conduct of these futures professionals. NFA also performs arbitration and dispute resolution functions for industry participants.  CFTC, *Glossary: A Guide to the Language of the Futures Industry*, National Futures Association (NFA) https://www.cftc.gov/LearnAndProtect/AdvisoriesAndArticles/CFTCGlossary/index.htm (last visited August 26, 2024).

Court found no issue of material fact that DaCorta engaged in misappropriation. None of these factual determinations is challenged in this appeal.

The District Court also found that the Oasis Entities operated commodity pools and were not ECPs.  The Court noted that there was no dispute that the victims' funds were aggregated and stated the record was clear the funds were invested for the trading of commodity interests.  In making this factual finding, the District Court relied on the CFTC's facts that relied on its investigator's bank analysis which showed victim funds being aggregated into certain bank accounts and being sent to a forex trading firm, as well as DaCorta's own testimony that "this was a forex opportunity run through a note structure."  Appendix X at 245 (ECF No. 780) (relying on Appendix II at 145 (ECF No. 749) (citing to Appendix I at 124-131 & 139, 141 (ECF No. 4-1, 4-11); Appendix VI at 256-263 (ECF No. 749-5); Supp Appendix I at 98 (ECF No. 4-9); Appendix IV at 15 (Tr. 50:5-10), (ECF No. 749-3); Appendix III at 31 (Tr. 94:1-8))).  The District Court determined that the use of the promissory note structure did not affect whether the entities could be classified as commodity pools.  Appendix X at 245-46 (ECF No. 780).

Because the Oasis Pools were commodity pools, the Court focused on the question of whether any of the participants in the pools were ECPs, looking to the definition of ECP in 7 U.S.C. § 1a(18)(A)(iv)(II).  The Court found no dispute of material fact that at least some of the pool participants did not qualify as ECPs,

13

citing testimony of several pool participants. Appendix X at 246-47 (ECF No. 780). The District Court also noted that DaCorta openly acknowledged he engaged in forex trading citing the CFTC's proffered fact, in which DaCorta had admitted that he was responsible for all investment decisions, including but not limited to trade execution and managing the relationship with a forex firm. Appendix X at 248 (ECF No. 780).

Thus, the District Court granted the CFTC's motion for summary judgment on all counts of the complaint and denied DaCorta's motion. Appendix X at 228-273 (ECF No. 780). It ordered civil injunctive relief, including enjoining DaCorta from trading in commodity interests, and further ordered DaCorta to pay restitution in the amount of $53,270,336.08, and civil monetary penalties in the amount of $8,453,628.48. Appendix X at 275-276 (ECF No. 781). Final judgment was entered on December 7, 2023. Appendix X at 275-276 (ECF No. 781). This appeal followed.

## STANDARD OF REVIEW

This Court reviews the district court's grant of summary judgment de novo, with any facts and inferences viewed in DaCorta's favor. *Fuentes v. Classica Cruise Operator Ltd*, 32 F.4th 1311, 1315 (11th Cir. 2022). Questions of law, including statutory interpretation are reviewed de novo. *Commodity Futures Trading Comm'n v. Levy*, 541 F.3d 1102, 1110 (11th Cir. 2008) (abrogated on

14

other grounds regarding the measure of restitution by 7 U.S.C. § 13a-1(d)(3)(A)). This Court may refuse to consider appellant's arguments that were not presented first to the district court. *Access Now, Inc. v. Sw. Airlines Co.*, 385 F.3d 1324, 1331 (11th Cir. 2004).

## SUMMARY OF ARGUMENT

The District Court correctly determined the CFTC is entitled to summary judgment on all five counts against DaCorta because no genuine issue of material fact exists on any of the counts. DaCorta failed to properly raise several of his arguments in this Court in the District Court, and thus several of his arguments are waived. Regardless of waiver, DaCorta's arguments all amount to attempts to circumvent CFTC jurisdiction by casting his solicitations and acceptance of funds for forex trading as solicitations for a promissory note scheme, and to suggest his trading of victims' funds was not trading for or on behalf of his victims. However, the fact that his victims signed promissory notes is of no moment. DaCorta told the victims he would be trading forex with their funds, DaCorta accepted their funds and traded forex with those funds, and DaCorta even testified in his criminal trial that this fraud "was a forex opportunity run through a note structure." Appendix IV at 15 (Tr. 50:5-10), 17 (Tr. 52:7-18), & 169 (Tr. 169:12-14) ("Q: And so this was a forex opportunity run through a note structure; is that fair? A: yes") (ECF No. 749-3). The existence of the promissory notes cannot relieve him of

15

liability under any of the CEA's antifraud sections nor can it transform a commodity pool into something else.

DaCorta also tries to evade CFTC jurisdiction by claiming, without evidence, that the Oasis Pools were eligible contract participants, but he cannot create a genuine issue of material fact having failed to make any such argument in the district court or, at the very least pointing to *some* evidence offered in the summary judgment briefing.

## ARGUMENT

### I.    The District Court's Grant of Summary Judgment to the CFTC on Section 4b Was Appropriate

Appellant's first argument to overturn the district court's grant of summary judgment focuses on his liability under Section 4b based on the text of the statute. 7 U.S.C. § 6b.  The District Court granted the CFTC summary judgment on Count I of the CFTC's Amended Complaint, Fraud in Connection with Forex Transactions, finding DaCorta violated Section 4b and Regulation 5.2, 17 C.F.R. § 5.2.  DaCorta makes no argument that the District Court's decision on Regulation 5.2 was inappropriate.  Thus, even if the Court were to entertain DaCorta's unpreserved argument on the text of Section 4b, the CFTC would remain entitled to summary judgment on Count I based on DaCorta's violations of Regulation 5.2.

16

### A. This Court Should Not Entertain DaCorta's Waived and Baseless Argument that the Relevant Forex Transactions Were Not "For or On Behalf Of" His Victims

Appellant's argument based on the text of Section 4b is waived, factually incorrect, and legally wrong. The relevant antifraud section, CEA Section 4b, makes it unlawful, in relevant part, "for any person, in or in connection with any order to make, or the making of, any contract of sale of any commodity for future delivery, or swap, that is made, or to be made, for or on behalf of, or with, any other person, other than on or subject to the rules of a designated contract market" to commit fraud, make a false statement, or willfully deceive. DaCorta does not challenge that he made a misrepresentation, had scienter, or that the misrepresentations were material.[7] *See CFTC v. R.J. Fitzgerald*, 310 F.3d 1321,

---

[7] DaCorta makes an incomprehensible argument, without citation, that the District Court erroneously relied on collateral estoppel to preclude DaCorta from arguing the elements of scienter and materiality. Brief at 32. Collateral estoppel can bar "a defendant who is convicted in a criminal trial from contesting this conviction in a subsequent civil action with respect to issues necessarily decided in the criminal trial." *SEC v. Rand*, 805 F. App'x 871, 875 (11th Cir. 2020). DaCorta's argument about collateral estoppel fails. First, the District Court applied it to the elements of scienter and materiality, and Dacorta cannot show that this prejudiced him as he did not argue in his summary judgment briefing that the CFTC could not meet the elements of scienter or materiality. Appendix X at 223 (ECF No. 757) (focusing argument on solvency, whether the Oasis entities were commodity pools, whether the entities fit the definition of an ECP, and whether the entities engaged in retail forex transactions but not arguing scienter or materiality); Appendix X at 223 (ECF No. 757) (same). Second, the brief argues that the District Court should not have precluded DaCorta from arguing scienter and materiality because there was no proof at the criminal trial that defendants "entered into contracts with other people for the purpose of the sale of a commodity or for making forex transactions

17

1329 (11th Cir. 2002) (laying out the elements for the CFTC to prove on a charge of Section 4b).  Indeed, he was criminally convicted of as much.  *United States v. DaCorta*, 2024 WL 1905330, at \*2 (11th Cir. May 1, 2024) (sustaining DaCorta's conviction of conspiracy to commit wire fraud, among other charges).

Instead, DaCorta focuses his argument on the text of Section 4b of the Act— stating the fraud was not "in connection with any order to make, or the making of, any contract of sale of any commodity for future delivery, or swap, that is made, or to be made, *for or on behalf of*, or with, any other person…."  Brief at 39.  This appeal is the first time DaCorta has raised any argument based on the text of Section 4b.  His summary judgment motion and opposition to the CFTC's motion for summary judgment made no such argument.  Appendix X at 218-224 (ECF No. 757); Appendix IX at 132-140 (ECF No. 750).  Thus, DaCorta's argument based on the text of Section 4b is unpreserved and this Court may decline to entertain it. *Federal Deposit Ins. Corp. v. 232, Inc.*, 920 F.2d 815, 817 (11th Cir.1991); *see also Ashley v. Jaipersaud*, 544 F. App'x 827 (11th Cir. 2013) (declining to consider an argument that "argue[s] a different case from the one he "presented to the

---

or retail forex transactions on behalf of others."  Brief at 32.  However, the District Court made independent findings on the misrepresentations that DaCorta made to others, citing to specific facts set forth in the CFTC's statement of facts and noting DaCorta's failure to dispute them.  To the extent the District Court did not focus on either the "in connection with" or the "for or on behalf of" textual aspects of Section 4b, that is because both DaCorta failed to raise those arguments.

18

district court." (*quoting Irving v. Mazda Motor Corp.*, 136 F.3d 764, 769 (11th Cir.1998))).

The underlying factual record before the District Court makes it clear why DaCorta made no such argument there—DaCorta's bald assertions are without evidentiary support.  For instance, even the Promissory Note and Loan Agreement, which DaCorta cites in his brief, states that victims will receive "twenty-five percent (25.00%) of the Transaction Fees." Brief at 17.  Those transaction fees are based on DaCorta's forex trading.[8]  The District Court cited to the Receiver's declaration summarizing and attaching transcripts of solicitation calls DaCorta had been involved in, which are in the record.  In one, DaCorta explains: "you're involved in every single trade I do all the time regardless of how much money we have in the pool."  Appendix II at 45 (Tr. 23:7-10) (ECF No. 165-5).  Thus, the solicitations included victims being told they would receive fees based on each forex transaction, called "spread pay."  Further, DaCorta did not contest the CFTC's fact, beyond its word choice, that each pool participant was assigned a share of the profits, losses, and spread pay via the Oasis Entities' "back office." Appendix II at 148 (ECF No. 749 at ¶25) (citing to Appendix IV 125-126 (Tr.

---

[8] Because DaCorta made no argument based on "for or on behalf of," the District Court had no need to cite to each of the particular facts cited herein, and the CFTC had no reason to argue such facts below.  On appeal, all of the facts that the CFTC cites to rebut this unpreserved argument were contained in the record before the District Court, and are contained in the appendices before this Court.

19

160:19-161:1) (ECF No. 749-3) (DaCorta criminal trial testimony)); Appendix X at 205 (ECF No. 757 at ¶25). In other words, the record demonstrates that the victims were to receive "spread pay" based on the retail forex transactions that DaCorta entered. This payment structure belies DaCorta's assertions that his transactions were not made for or on behalf of his victims.

With record evidence demonstrating DaCorta's argument is not grounded in the facts of this case, the CFTC respectfully submits that this court should decline to address the question. *Access Now, Inc v. Southwest Airlines*, 385 F.3d 1324 (11th Cir. 2004) ("The reason for this prohibition is plain: as a court of appeals, we review claims of judicial error in the trial courts. If we were to regularly address questions—particularly fact-bound issues—that district courts never had a chance to examine, we would not only waste our resources, but also deviate from the essential nature, purpose, and competence of an appellate court.")

### B. The Antifraud Section 4b Reaches DaCorta's Conduct Under His Own Theory

Even if DaCorta had not waived his argument, and setting aside the factual question relating to spread pay, it still fails. As an initial matter, Section 4b should be construed broadly. This Court is "guided by the principle that the CEA is a remedial statute that serves the crucial purpose of protecting the innocent individual investor." *R.J. Fitzgerald*, 310 F.3d at 1329. Further, "[r]emedial statutes are to be construed liberally, and in an era of increasing individual

participation in commodities markets, the need for such protection has not lessened." *Id.* (quoting *R&W Technical Servs., Ltd. v. CFTC*, 205 F.3d 165, 173 (5th Cir. 2000)).

The Commodity Exchange Act is intended to "deter and prevent . . . disruptions to market integrity" and to "protect all market participants from fraudulent or other abusive sales practices and misuses of customer assets." 7 U.S.C. § 5(b). To further this purpose, courts have found that the CFTC may bring a fraud claim in connection with a jurisdictional product where the fraudulent statements referenced the product but the defendant did not trade. *See, e.g.*, *CFTC v. JBW Capital, LLC*, 812 F.3d 98, 109 (1st Cir. 2016) (noting that case law is settled on the broad interpretation of the "in connection with" language of the statute, and applying it to the defendant's misrepresentations made during his solicitations, despite no actual transactions flowing from those solicitations) (citing *Saxe v. E.F. Hutton & Co.*, 789 F.2d 105, 110-11 (2d Cir. 1986) ("By its terms, Section 4b is not restricted … to instances of fraud or deceit 'in' orders to make or the making of contracts. Rather, Section 4b encompasses conduct 'in or in connection with' futures transactions. The plain meaning of such broad language cannot be ignored.") (quoting *Hirk v. Agri-Research Council, Inc.*, 561 F.2d 96, 103-04 (7th Cir. 1977)); *R&W Technical Services, Ltd,* 205 F.3d at 173 (applying Section 4b to misrepresentations about software sold to recommend futures

products); *CFTC v. Vartuli*, 228 F.3d 94, 102 (2d Cir. 2000) (same); *see also CFTC v. Equity Financial Group, LLC*, 572 F.3d 150, 157 (3d Cir. 2009) (holding in the context of fraud by a commodity pool operator that "[t]he solicitation, acceptance, or receipt of funds must be 'for the purpose of trading' but nothing in the statute imposes an actual trading requirement.").

Appellant isolates the "for or on behalf of" language and argues that he did not trade for on behalf of any of the pool participants. Specifically, the Oasis Entities structured the scheme as "loans" from victims. His legal argument fails for two reasons: first, even if DaCorta's *trading* was not "for or on behalf of" the victims, his *solicitations* gave that impression. DaCorta's own solicitations, as evidenced in the record, demonstrate that however he structured the program, a reasonable person would understand the trading was for the benefit of the customer. In other words, the overall message of the solicitations can meet the "for or on behalf of" language. *Cf. R.J. Fitzgerald*, 310 F.3d at 1328 (stating the relevant question for a misrepresentation was the overall message as interpreted by an objectively reasonable viewer and stating a general disclosure does not preclude liability where the overall message is objectively misleading or deceptive). Second, as explained further below, under ordinary plain meaning, this trading was "for or on behalf of" the victims because he had an agency-like relationship with his victims. *See Hammond v. Smith Barney Harris Upham & Co.*, CFTC No. 86-

22

R131, 1990 WL 282810, at n.16 (CFTC Mar. 1, 1990) (noting that Section 4b applies "when there is an agency-like relationship between the damaged party and the wrongdoer (i.e. when the wrongdoer is acting "for or on behalf of [the] other person"); *see also Commodity Trend Serv. v. CFTC*, 233 F.3d 981, 992 (7th Cir. 2000) (stating the provision applies to brokers or others who have an agency relationship with their clients).

1. *DaCorta's Solicitations Are Sufficient to Demonstrate that He Was Soliciting to Trade "For or On Behalf Of" Others*

DaCorta's criminally fraudulent misrepresentations referenced forex trading in a way that can be understood to violate Section 4b. Though not offered for this purpose in the CFTC's summary judgment briefing, as this argument was not made in the district court, the CFTC's briefing included transcripts of phone calls where DaCorta solicited an undercover FBI agent. Those transcripts included:

- "The way we do it is simple. A person will put their money into our proprietary trading client—proprietary trading account" (Appendix II at 24 (Tr. 18:20-22) (ECF No. 165-5)).

- Describing the scheme as an "investment" and the money as "your money." (Appendix II at 24 (Tr. 19:11-22) (ECF No. 165-5)).

- "The note states that you'll get a minimum of 12 percent per year or 25 percent of the spreads that we capture on a daily basis using your capital." (Appendix II at 33 (Tr. 17:17-20) (ECF No. 165-5)).

- Describing how to roll over an IRA or 401k and stating "we are approved as (inaudible) custodian of institutional accounts there, and we have people in our firm that will help guide you through the process" (Appendix II at 34 (Tr. 18:12-18) (ECF No. 165-5)).

- An explanation that before 2017 (but during the Relevant Period) the Oasis Entities traded money in managed accounts. (Appendix II at 23-24 (Tr. 17:3-18:1) (ECF No. 165-5)).[9]

Those solicitations make clear that DaCorta is soliciting an agency-like relationship. The "loans" are an *investment* of *your* money, it's put into a proprietary trading account and the Oasis Entities are a custodian of person's retirement accounts. Courts regularly find CFTC's jurisdiction is implicated on the basis of solicitations. *See, e.g.*, *JBW Capital, LLC*, 812 F.3d at 109 (applying Section 4b to the defendant's misrepresentations he made during his solicitations, despite no actual trading); *Vartuli*, 228 F.3d at 102 (same); *see also Equity Financial Group, LLC*, 572 F.3d 150, 157 (3d Cir. 2009) (no actual trading

---

[9] The fact that this scheme changed during the Relevant Period from a more traditional model to a promissory note model also underscores the lack of factual development of this unpreserved argument, and if the Court were to determine that the promissory notes affected the CFTC's jurisdiction, the CFTC submits remand would be necessary to develop a record regarding when the scheme transformed. Appendix IV at 11 (Tr. 46:7-20).

24

requirement under Section 4*o* where a commodity pool operator solicits, accepts, or receives funds for the purpose of trading).

### 2. DaCorta's Promissory Note Scheme Does Not Sever the Agency-Like Relationship He Had with His Victims

The requirement of an agency-like relationship, construed broadly, fits within the plain meaning of "for or on behalf of" as well as judicial interpretations of the phrase. According to Merriam-Webster, "for" may be "used as a function word to indicate purpose (a grant *for* studying medicine)." *See For Definition*, MERRIAM-WEBSTER.COM, http://www.merriam-webster.com/dictionary/for. "Behalf" means "interest, benefit" and "on behalf of" means "in the interest of." *See Behalf Definition*, MERRIAM-WEBSTER.COM, http://www.merriam-webster.com/dictionary/behalf. Further, other judicial constructions of the phrase "for or on behalf of" have been expansive. For instance, in *Dixson v. United States,* 465 U.S. 482 (1984)*,* the Supreme Court used a functional definition to construe whether a person was acting "for or on behalf of the United States" for purposes of the federal bribery statute. 465 U.S. 482, 499-50 (1984) (determining officers of a private nonprofit corporation could be considered public officials for purposes of the bribery statute because they possessed "some degree of official responsibility" and "some duties of an official nature.") Thus, the trading was "for or on behalf of" if the trading was done for the purpose of the victims or in the interest of or for the benefit of the victims (i.e. an agency-like relationship).

25

Even under DaCorta's unsupported version of the facts—wherein he received loans and paid back interest without any reference to transaction fees and/or spread pay—DaCorta still had an agency-like relationship with his victims. DaCorta traded forex using a subset of the funds received into the Oasis Entities bank accounts. Appendix X at 231, 234 (ECF No. 780). He was still trading *their* funds. The purpose of DaCorta's trading, crediting DaCorta's argument, was to generate money to pay back loans. In other words, the trading was in the interest of or for the benefit of the victims. Further, his victims retained an interest in those funds—their contributions were not unconditional gifts. DaCorta thus had custodial authority over the funds, but the funds still belonged to the victims: this is all that is required to trigger the agency-like relationship required by Section 4b. *See R&W Technical Serv. Ltd.*, 205 F.3d at 172 (5th Cir. 2000) (affirming a finding of liability under Section 4b where the defendant sold systems to recommend the victims trade themselves because "although the petitioners did not profit from customer trading by receiving commissions, the petitioners did not give their advice away and necessarily expected their customers to make trades. This expensive software had no purpose except as a device for choosing which trades to make."); *see also C.F.T.C. v. Gresham,* No. 3:09-CV-75, 2011 WL 8249266, at *7 (N.D. Ga. Sept. 8, 2011)*,* (finding defendant liable under Section 4b where he gave promissory notes to victims and promised a percentage of earnings). DaCorta has

26

attempted to contract around that agency-like relationship via a promissory note scheme, but to allow him to do so would frustrate the purposes of the remedial statute.

Finally, as discussed above, DaCorta makes no argument that any transaction need be "for or on behalf of" any victim to be liable under Regulation 5.2, 17 C.F.R. § 5.2.  Thus, even if this Court were to consider and find in favor of DaCorta's argument on Section 4b, DaCorta would remain liable under Count I.

### 3.  The Misrepresentations were "In Connection With" Forex Trading

Appellant contends that because the promissory notes were "legally distinct" from the forex transactions, that renders the misrepresentations "beyond the reach" of the CEA or regulation by the CFTC.  However, the "in connection with" language is broad: it covers misrepresentations where a fraudster did not actually enter into trades, *JBW Capital,* 812 F.3d at 109, and it covers software systems that will recommend trades to customers.  *Vartuli*, 228 F.3d at 102.

Appellant argues that the District Court did not have sufficient evidence to find that the Oasis Entities "solicited, received, and accepted funds" for forex trading.  This fact was not required for the District Court to grant summary judgment on Count I because Section 4b and Regulation 5.2 only require the fraud be "in connection with" a jurisdictional product—here, forex trading.  *See* 7 U.S.C. § 6b; *see also* Regulation 5.2(b) (prohibiting fraud "by use of the mails or by any

27

means or instrumentality of interstate commerce, directly or indirectly, in or in connection with *any* retail forex transaction") (emphasis added).  Because this fact is necessary for the finding of a commodity pool, this argument will be further addressed, *infra.*

The District Court had ample facts to make a finding that the misrepresentations were done in connection with forex transactions.  The Court relied on the actual trading done in the Oasis Pools—specifically, the Court credited the declaration of Commission investigator, Elsie Robinson, which included a detailed bank analysis and an account of where the Oasis Pools traded, including that the Oasis Entities received funds from customers and sent a subset of those funds to forex trading firms.  Appendix X at 245 (ECF No. 780).  Further, DaCorta's criminal testimony included an admission that he was trading forex.  Appendix IV at 19 (Tr. 54:11-20), 15 (Tr. 50:5-10), 20 (Tr. 55: 19-22), 22 (Tr. 57:3-11), 83-84 (Tr. 118:18-12024), 169 (Tr. 204:9-14) ("Q: And so this was a forex opportunity run through a note structure; is that fair? A: yes") (ECF No. 749-3).  This evidence more than satisfies the "in connection with" requirement for purposes of Section 4b.

## II.    The Existence of a Promissory Note Scheme Does Not Convert a Commodity Pool into Something Else

Similar to DaCorta's argument on Count I, DaCorta challenges the District Court's determination on Count II not based on the fraud elements, but based on

28

whether or not the Oasis entities were Commodity Pool Operators. Unlike his basis for overturning Count I, his argument that the Oasis entities were not CPOs was preserved in the District Court. DaCorta contends that the Court erred in finding an existence of a commodity pool where the funds were received via promissory notes because while the funds were aggregated into a single account, the promissory notes meant the investors did not share in pro rata distribution of profits and losses. He also argues the District Court did not have support for its finding that the funds were invested for the purpose of trading commodity interests.

## A. The Text of the Statute Does Not Require Pro Rata Distribution

DaCorta's first argument that a commodity pool must share the profits and losses on a pro rata basis has no basis in the statutory definitions of commodity pool or commodity pool operator. The CEA defines a commodity pool operator as "any person engaged in a business that is of the nature of a commodity pool, investment trust, syndicate, or similar form of enterprise, and who, in connection therewith, solicits, accepts, or receives from others funds, securities, or property, either directly or through capital contributions, the sale of stock or other forms of securities, or otherwise, for the purpose of trading in commodity interests...." 7 U.S.C. § 1a(11). It defines a commodity pool as "any investment trust,

29

syndicate, or similar form of enterprise operated for the purpose of trading in commodity interests…" 7 U.S.C. § 1a(10).

Neither of the CEA definitions are premised on the nature of the sharing in profits or losses, rather they make clear that the definitions are based in functionality. The definitions focus on the form of the enterprise, and whether the enterprise solicits, accepts, or receives funds for the purpose of trading commodity interests. Neither requirement turns on a specific method of profit sharing. Specifically, for the first requirement, both definitions ask whether the pool is "similar form of enterprise" as an investment trust or syndicate. 7 U.S.C. 1a(10)&(11). Black's Law Dictionary defines a syndicate, in relevant part, as "a group organized for a common purpose; esp., an association formed to promote a common interest, carry out a particular business transaction . . . ." *Syndicate*, Black's Law Dictionary (12th ed. 2024). If the pool is "similar" to a group organized for a common purpose or to carry out a particular transaction, that is sufficient to meet this definition. The pool need only be similar to an investment trust or syndicate to trigger the form of enterprise portion of the definition.

Here, the Oasis Entities were, at the very least, a similar form of enterprise to an investment trust or syndicate, and that can be demonstrated through the aggregation of the pool funds. DaCorta argues that the district court improperly relied on *CFTC v. Amerman*, 645 F. App'x 938, 941-42 (11th Cir 2016), when it

30

found that the aggregation was the essential aspect of the commodity pool. Brief at

49. DaCorta argues that because pro rata distribution was an aspect of the pool in

*Amerman*, it must be an aspect of all pools. As this court noted in *Amerman*, "the

sine qua non of a commodity pool is 'the aggregation of investors' funds into a

single account.'" 645 F. App'x at 941-42. While the pool in that matter did

involve the sharing of profits and losses on a pro rata basis, that was simply the

way that pool was organized. *Id*. The *Amerman* Court correctly held, however,

the essential feature of a pool was the aggregation for the purpose of trading

commodity interests. *See id*. As stated above, the CEA is a remedial statute and

should be broadly construed. *See R&W Technical Services*, 205 F.3d at 173. To

require pro rata distribution for an enterprise which otherwise meets the statutory

definition would frustrate the remedial purposes of the statute.[10]

The District Court's determination that the manner of sharing of profits or

losses had no bearing on the question of whether the Oasis entities were CPOs

_____

[10] While pro rata distribution may be a common feature of a commodity pool, it is
not a feature of every commodity pool. Commodity pools may have "special
allocations," or distributions that are not pro rata, which are subject to specific
reporting regulations. *See* 17 C.F.R. § 4.22(e)(2). Other commodity pools may be
"principal-protected pools," commonly referred to as a "guaranteed pool," which is
another example where the distribution of the pools' assets may not be pro rata. 17
C.F.R. § 4.10(d)(3). The existence of these regulations demonstrates that while
many pools may follow pro rata profit sharing model, it is not a required element
to be a pool.

31

follows the relevant statutory definitions and this Court's holding in *Amerman*. The District Court rightly kept the focus on the nature of the business—the aggregation of the funds and the purpose of the aggregation. This focus flows from the definition in the statute which asks whether the potential pool is of the nature of an association formed to promote a common interest or carry out a particular transaction (i.e., a similar form of enterprise as an investment trust or syndicate or pool) *and* whether it solicits, accepts, or receives funds, securities, or property, for the purpose of trading in commodity interests.

### B. The District Court Properly Found the Funds Were for the Purpose of Trading in Commodity Interests.

In determining the funds were solicited, accepted, or received for the purpose of trading in commodity interests, the district court relied in part on DaCorta's criminal trial testimony when he testified that a percentage of the "loans" would be used for collateral deposit for foreign exchange trading. Appendix X at 245 (citing Appendix IV at 15 (Tr. 50:5-10) (ECF No. 749-3)). The Court also relied on the CFTC's facts, such as its investigator's bank analysis, which included the deposit and withdrawal activity of the bank accounts and detailed the receipt of funds from pool participants and a subset of those funds being sent to forex accounts. Appendix X at 245 (EFC No. 780) (citing to

32

Appendix II at 145 (ECF No. 749) (citing Appendix I at 128-31, 139 (ECF No. 4-11))).

Thus, the District Court relied on sufficient evidence to determine that the Oasis Entities solicited, accepted, or received the funds for the purpose of forex trading—here, it appears based on the evidence relied on, the District Court focused on the acceptance and receipt of the funds. Demonstrating the acceptance and receipt of funds for trading commodity interests is sufficient to find a commodity pool under *Amerman*. 645 Fed. App'x at 942 (noting that "Even if we assume, as Amerman argues, that a question of fact exists regarding whether Amerman solicited funds for trading in commodity interests, the record leaves no room for doubt that Amerman accepted and received such funds.").

DaCorta appears to base his argument regarding the promissory notes on the unsupported assertion that his victims did not believe they were sending funds for the purpose of trading commodity interests. Brief at 42. DaCorta's argument here is based on innuendo and not supported by the factual record.[11] DaCorta's own

---

[11] In fact, several victims at the criminal trial testified that they believed the opposite, and in summation on rebuttal the government argued to the jury: "Now, the Defendant insists that the risk disclosure is the end-all and be-all document here and that it shows that all of the investors knowingly agreed that they were going to give him this money and he could do whatever he wanted with it, but what he said to investors was different. Recall Patti Katter's testimony. She asked him about it, and she said he said to her, "Don't worry about that legalese. Don't concern yourself about that. That's something the lawyers tell us we have to put in there. 99 percent of that would never happen, and if anything happens, I will take

facts offered to the District Court in support of his summary judgment motion demonstrate that his victims believed that Oasis would trade forex with their funds, among other things.  Appendix IX at 109 (ECF No. 750).  ("[Mr. McKee] understood the diversified company would invest in forex trading, real estate investments, purchasing and selling gold and silver and buying into different businesses and companies").  Further, his brief cites to a "Use of Funds" clause in the Risk Disclosure document that the Oasis Entities provided to pool participants which stated that the funds may be used for "the purchase or sale of foreign exchange products."  Brief at 9 (citing Appendix IX at 152 (ECF 750-1)).  This fact is, alone, sufficient to find a commodity pool.  *See United States v. Wilkinson*, 986 F.3d 740, 744 (7th Cir. 2021) (noting that while a criminal defendant's business offered a private placement memoranda that stated it was not intended to operate as a commodity pool, the fact that it said the funds were intended "to trade a variety of stock indexes and options, futures, and options on futures on such stock indexes" provided sufficient evidence to qualify the defendant as a commodity pool operator).

While the solicitations for the purpose of trading commodity interests is adequate to establish a pool, it is not necessary to establish a pool.  As discussed

---

care of you. You're my friends."  Appendix IX at 35 (Tr. 23:12-21) (ECF No. 749-10).

34

above, the CEA does not require that pool participants be *solicited* for the purpose

of commodities—a CPO may solicit, accept, *or* receive funds for this purpose, as

this Court has already held in *Amerman*.  645 Fed. App'x at 942 (finding the

acceptance and receipt of funds for the purpose of trading commodity interests

sufficient).  Nor does the promissory note scheme transform his acceptance and

receipt of victims' funds into acceptance or receipt for any other purpose.  DaCorta

testified in his criminal trial that this was a "forex opportunity," and he accepted

and received victims' funds for that purpose.   Appendix IV at 15 (Tr: 50:5-10), 17

(Tr: 52:7-18), & 169 (Tr: 204: 12-14) "Q: And so this was a forex opportunity run

through a note structure; is that fair? A: yes") (ECF No. 749-3).  By his own

testimony and evidence from the bank accounts, at least part of the funds received

by the Oasis Entities were used to trade commodity interests, which is sufficient to

find that the Oasis entities were commodity pool operators.  *See Wilkinson*, 986

F.3d at 744 (affirming a sentencing enhancement as a commodity pool operator

where there was "sufficient evidence that the fraudulent fund operated, *at least in

part,* 'for the purposes of trading in'" a commodity interest) (emphasis added).

Finally, even if the Court were to find the promissory note scheme

circumvents the CEA regime on commodity pools, the CFTC submits the case

should be remanded for further development of the factual record, as the fraud

covers time periods before and after DaCorta began styling his investment scheme

35

as one involving promissory notes.  Appendix IV at 14 (Tr 46:2-24) (ECF No. 749-3) (Michael DaCorta's criminal testimony that the promissory note scheme began in 2017); Appendix II at 140 (ECF No. 749) (defining the Relevant Period beginning in 2014).

### C. The Fact that the Oasis Entities Were Commodity Pools Precludes DaCorta's Arguments on Counts III, IV, and V

For the above-stated reasons, the District Court had sufficient evidence to determine the Oasis Entities were commodity pools.  Because the Oasis Entities were commodity pools, DaCorta's arguments on Counts III, IV, and V fail as a matter of law, because each argument is premised on the faulty contention that the entities were not commodity pools.  Specifically, DaCorta does not contest that (1) the Oasis Entities failed to register the Oasis Entities as Commodity Pool Operators (a requirement for commodity pools), which the District Court found DaCorta liable for as a control person for the Oasis Entities (Count III); (2) the Oasis Pools commingled pool funds (a prohibition for commodity pools), which the District Court found DaCorta liable for as a control person (Count IV); or (3) the Oasis Pools failed to provide the required disclosures (mandatory for commodity pools), which DaCorta was also liable for as a control person (Count V).

DaCorta does argue that he is not liable for Count III because he did not qualify as an Associated Person of the Oasis Entities.  However, in support of its

36

determination, the District Court cited DaCorta's trial testimony, where he stated that he participated in calls with potential investors.  Appendix X at 233 (ECF No. 780) (citing Appendix IV at 171-72 (Tr. 205:4-11, 206:8-15) (ECF No. 749-3)).  Both Regulation 1.3 and Regulation 5.1(d)(2) define an associated person of a CPO as someone who is involved with the solicitation of funds or the supervision of persons who are involved in soliciting funds.  17 C.F.R. §§ 1.3, 5.1(d)(2).  This evidence is sufficient for the district court's grant of summary judgment.

### III.    The District Court Properly Determined the Oasis Entities and DaCorta Were Not Eligible Contract Participants

The District Court noted that because the Oasis entities were commodity pools, to qualify as an Eligible Contract Participant under 7 U.S.C. § 1(A)(18)(A)(xi)), they could not include any individual who did not meet the definition of an ECP (as relevant here, a person would qualify as an ECP if they "ha[d] amounts invested on a discretionary basis, the aggregate of which is in excess of … $10,000,000; or . . . $5,000,000 and who enters into an agreement, contract, or transaction in order to manage risk.")  Appendix X at 246 (ECF No. 780).  The District Court found, however, that several participants provided testimony that demonstrated they did not qualify as an ECP.  Appendix X at 256 (ECF No. 780) (relying on Supp. Appendix I at 116 (ECF 762) citing to Supp Appendix I at 143 (Tr. 19:1-6), Supp Appendix I at 165 (Tr. 41:14-22), and Supp Appendix III at 27 (Tr. 138:14-23).  DaCorta does not challenge the District

Court's determination that at least some of the pool participants did not meet this definition.

DaCorta's argument is premised upon a different prong of the ECP definition, specifically 7 U.S.C. § 1(A)(18)(A)(v)(III), which applies to a corporation with a net worth exceeding $1,000,000 that engages in forex trading in connection with the conduct of its business or to manage the risk associated with an asset or liability in the conduct of its business. However, DaCorta put forth no facts to raise an issue that the Oasis Entities could meet either prong required by 7 U.S.C. § 1(A)(18)(A)(v)(III). Indeed, the District Court noted DaCorta's deficiencies on his summary judgment briefing. Appendix X at 242-43 (ECF No. 780) ("As a preliminary matter, this Court notes that it agrees with the CFTC's assessment that DaCorta's Motion does not comply with the Court's order regarding summary judgment motions. (Doc. # 756 at 1). The Motion does not contain a section titled "Statement of Material Facts" with each fact "supported by a pinpoint citation to the specific part of the record relied upon to support that fact." (Doc. # 659 at 2).") Nor could DaCorta have offered any such evidence. The District Court had evidence that neither entity was operated like a typical company. Appendix X at 230 (ECF No. 780). Neither entity retained standard written policies nor prepared income statements that disclosed their losses. Appendix X at 230 (ECF No. 780). Without evidence or even an argument to

support the contention that the District Court should consider the definition in Section 1a(18)(v)(III), the District Court's decision was appropriate. *See Reese v. Herbert*, 527 F.3d 1253, 1268 (11th Cir. 2008) (*quoting Smith v. Lanz*, 321 F.3d 680, 683 (7th Cir. 2003) ("a mere disagreement with the movant's asserted facts is inadequate if made without reference to specific supporting material . . . [j]udges are not like pigs, hunting for truffles buried in briefs.")) DaCorta would have needed to point to evidence of the entities' net worth, and with the evidence before the district court, specifically that the entities were not operated like a typical business entity, the District Court could properly enforce its summary judgment rules requiring specific facts and ignore DaCorta's unsupported statement. *See Reese*, 527 F.3d at 1268.

## CONCLUSION

For the above stated reasons, the CFTC respectfully requests that this Court affirm the judgment of the district court.

Dated: August 28, 2024

Respectfully Submitted,

/s/ Margaret Aisenbrey
Robert A. Schwartz
*General Counsel*
Anne W. Stukes
*Deputy General Counsel*
Margaret Aisenbrey

39

*Assistant General Counsel*
Commodity Futures Trading Commission
2600 GRAND BLVD STE 210
KANSAS CITY, MO 64108

**CERTIFICATE OF COMPLIANCE**

I hereby certify under Fed. R. App. P. 32(g)(1) the following:

1.  This document complies with the type-volume limit of Fed. R. App. P. 32(a)(7)(B) because, excluding the parts of the brief exempted by Fed. R. App. P. 32(f), it contains 9549 words, as counted by the wordprocessing software Microsoft Word.

2.  This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5)-(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word, in Times New Roman 14-point type.


Dated: August 28, 2024                           /s/ Margaret Aisenbrey
                                                 Margaret Aisenbrey
                                                 Counsel for Appellee
                                                 Commodity Futures Trading
                                                 Commission

41

42

## CERTIFICATE OF SERVICE

I hereby certify that on August 28, 2024, I served the foregoing Brief of

Appellee on counsel of record using this Court's CM/ECF system.

/s/ Margaret Aisenbrey

Margaret Aisenbrey
Counsel for Appellee

## REPRODUCTION OF STATUTES, RULES, REGULATIONS

7 U.S.C. § 1a(10) **Commodity pool**

**(A)**In general

The term "commodity pool" means any investment trust, syndicate, or similar form of enterprise operated for the purpose of trading in commodity interests, including any—

>**(i)** commodity for future delivery, security futures product, or swap;

>**(ii)** agreement, contract, or transaction described in section 2(c)(2)(C)(i) of this title or section 2(c)(2)(D)(i) of this title;

>**(iii)** commodity option authorized under section 6c of this title; or

>**(iv)** leverage transaction authorized under section 23 of this title.

**(B)**Further definition

The Commission, by rule or regulation, may include within, or exclude from, the term "commodity pool" any investment trust, syndicate, or similar form of enterprise if the Commission determines that the rule or regulation will effectuate the purposes of this chapter.

7 U.S.C. § 1a(11) Commodity Pool Operator

**(A)**In general

The term "commodity pool operator" means any person—

>**(i)**engaged in a business that is of the nature of a commodity pool, investment trust, syndicate, or similar form of enterprise, and who, in connection therewith, solicits, accepts, or receives from others, funds, securities, or property, either directly or through capital contributions, the sale of stock or other forms of securities, or otherwise, for the purpose of trading in commodity interests, including any—

>>**(I)** commodity for future delivery, security futures product, or swap;

43

**(II)** agreement, contract, or transaction described in section 2(c)(2)(C)(i) of this title or section 2(c)(2)(D)(i) of this title;

**(III)** commodity option authorized under section 6c of this title; or

**(IV)** leverage transaction authorized under section 23 of this title; or

**(ii)** who is registered with the Commission as a commodity pool operator.

**(B)** Further definition

The Commission, by rule or regulation, may include within, or exclude from, the term "commodity pool operator" any person engaged in a business that is of the nature of a commodity pool, investment trust, syndicate, or similar form of enterprise if the Commission determines that the rule or regulation will effectuate the purposes of this chapter.

7 U.S.C. § 6b Contracts Designed to Defraud or Mislead

**(a)** Unlawful actions

It shall be unlawful—

**(1)** for any person, in or in connection with any order to make, or the making of, any contract of sale of any commodity in interstate commerce or for future delivery that is made, or to be made, on or subject to the rules of a designated contract market, for or on behalf of any other person; or

**(2)** for any person, in or in connection with any order to make, or the making of, any contract of sale of any commodity for future delivery, or swap, that is made, or to be made, for or on behalf of, or with, any other person, other than on or subject to the rules of a designated contract market—

**(A)** to cheat or defraud or attempt to cheat or defraud the other person;

**(B)** willfully to make or cause to be made to the other person any false report or statement or willfully to enter or cause to be entered for the other person any false record;

**(C)** willfully to deceive or attempt to deceive the other person by any means whatsoever in regard to any order or contract or the disposition or execution of any order or contract, or in regard to any act of agency

44

performed, with respect to any order or contract for or, in the case of paragraph (2), with the other person; or . . . .

17 C.F.R. 5.2 Prohibited Transactions

**(a)** *Scope.* The provisions of this section shall be applicable to any retail forex transaction.

**(b)** *Fraudulent conduct prohibited.* It shall be unlawful for any person, by use of the mails or by any means or instrumentality of interstate commerce, directly or indirectly, in or in connection with any retail forex transaction:

>**(1)** To cheat or defraud or attempt to cheat or defraud any person;

>**(2)** Willfully to make or cause to be made to any person any false report or statement or cause to be entered for any person any false record; or

>**(3)** Willfully to deceive or attempt to deceive any person by any means whatsoever. . . .

7 U.S.C. § 6*o* Fraud and Misrepresentation by Commodity Trading Advisors, Commodity Pool Operators, and Associated Persons

**(1)** It shall be unlawful for a commodity trading advisor, associated person of a commodity trading advisor, commodity pool operator, or associated person of a commodity pool operator, by use of the mails or any means or instrumentality of interstate commerce, directly or indirectly—

>**(A)** to employ any device, scheme, or artifice to defraud any client or participant or prospective client or participant; or

>**(B)** to engage in any transaction, practice, or course of business which operates as a fraud or deceit upon any client or participant or prospective client or participant.

**(2)** It shall be unlawful for any commodity trading advisor, associated person of a commodity trading advisor, commodity pool operator, or associated person of a commodity pool operator registered under this chapter to represent or imply in any manner whatsoever that such person has been sponsored, recommended, or approved, or that such person's abilities or qualifications have in any respect been

45

passed upon, by the United States or any agency or officer thereof. This section shall not be construed to prohibit a statement that a person is registered under this chapter as a commodity trading advisor, associated person of a commodity trading advisor, commodity pool operator, or associated person of a commodity pool operator, if such statement is true in fact and if the effect of such registration is not misrepresented.

7 U.S.C. § 1a(18) **Eligible contract participant**

The term "eligible contract participant" means—

**(A)** acting for its own account—

    **(i)** a financial institution;

    **(ii)** an insurance company that is regulated by a State, or that is regulated by a foreign government and is subject to comparable regulation as determined by the Commission, including a regulated subsidiary or affiliate of such an insurance company;

    **(iii)** an investment company subject to regulation under the Investment Company Act of 1940 (15 U.S.C. 80a–1 et seq.) or a foreign person performing a similar role or function subject as such to foreign regulation (regardless of whether each investor in the investment company or the foreign person is itself an eligible contract participant);

    **(iv)** a commodity pool that—

        **(I)** has total assets exceeding $5,000,000; and

        **(II)** is formed and operated by a person subject to regulation under this chapter or a foreign person performing a similar role or function subject as such to foreign regulation (regardless of whether each investor in the commodity pool or the foreign person is itself an eligible contract participant) provided, however, that for purposes of section 2(c)(2)(B)(vi) of this title and section 2(c)(2)(C)(vii) of this title, the term "eligible contract participant" shall not include a commodity pool in which any participant is not otherwise an eligible contract participant;

46

**(v)** a corporation, partnership, proprietorship, organization, trust, or other entity—

> **(I)** that has total assets exceeding $10,000,000;

> **(II)** the obligations of which under an agreement, contract, or transaction are guaranteed or otherwise supported by a letter of credit or keepwell, support, or other agreement by an entity described in subclause (I), in clause (i), (ii), (iii), (iv), or (vii), or in subparagraph (C); or

> **(III)** that—

>> **(aa)** has a net worth exceeding $1,000,000; and

>> **(bb)** enters into an agreement, contract, or transaction in connection with the conduct of the entity's business or to manage the risk associated with an asset or liability owned or incurred or reasonably likely to be owned or incurred by the entity in the conduct of the entity's business;

**(vi)** an employee benefit plan subject to the Employee Retirement Income Security Act of 1974 (29 U.S.C. 1001 et seq.), a governmental employee benefit plan, or a foreign person performing a similar role or function subject as such to foreign regulation—

> **(I)** that has total assets exceeding $5,000,000; or

> **(II)** the investment decisions of which are made by—

>> **(aa)** an investment adviser or commodity trading advisor subject to regulation under the Investment Advisers Act of 1940 (15 U.S.C. 80b–1 et seq.) or this chapter;

>> **(bb)** a foreign person performing a similar role or function subject as such to foreign regulation;

>> **(cc)** a financial institution; or

>> **(dd)** an insurance company described in clause (ii), or a regulated subsidiary or affiliate of such an insurance company;

47

**(vii)**

> **(I)** a governmental entity (including the United States, a State, or a foreign government) or political subdivision of a governmental entity;
>
> **(II)** a multinational or supranational government entity; or
>
> **(III)** an instrumentality, agency, or department of an entity described in subclause (I) or (II);
>
> except that such term does not include an entity, instrumentality, agency, or department referred to in subclause (I) or (III) of this clause unless (aa) the entity, instrumentality, agency, or department is a person described in clause (i), (ii), or (iii) of paragraph (17)(A); (bb) the entity, instrumentality, agency, or department owns and invests on a discretionary basis $50,000,000 or more in investments; or (cc) the agreement, contract, or transaction is offered by, and entered into with, an entity that is listed in any of subclauses (I) through (VI) of section 2(c)(2)(B)(ii) of this title;

**(viii)**

**(I**) a broker or dealer subject to regulation under the Securities Exchange Act of 1934 (15 U.S.C. 78a et seq.) or a foreign person performing a similar role or function subject as such to foreign regulation, except that, if the broker or dealer or foreign person is a natural person or proprietorship, the broker or dealer or foreign person shall not be considered to be an eligible contract participant unless the broker or dealer or foreign person also meets the requirements of clause (v) or (xi);

**(II)** an associated person of a registered broker or dealer concerning the financial or securities activities of which the registered person makes and keeps records under section 15C(b) or 17(h) of the Securities Exchange Act of 1934 (15 U.S.C. 78o–5(b), 78q(h));

**(III)** an investment bank holding company (as defined in section 17(i)  of the Securities Exchange Act of 1934 (15 U.S.C. 78q(i));

**(ix)** a futures commission merchant subject to regulation under this chapter or a foreign person performing a similar role or function subject as such to foreign regulation, except that, if the futures commission merchant or foreign person is a natural person or proprietorship, the futures commission

48

merchant or foreign person shall not be considered to be an eligible contract participant unless the futures commission merchant or foreign person also meets the requirements of clause (v) or (xi);

**(x)** a floor broker or floor trader subject to regulation under this chapter in connection with any transaction that takes place on or through the facilities of a registered entity (other than an electronic trading facility with respect to a significant price discovery contract) or an exempt board of trade, or any affiliate thereof, on which such person regularly trades; or

**(xi)**an individual who has amounts invested on a discretionary basis, the aggregate of which is in excess of—

    **(I)** $10,000,000; or

    **(II)** $5,000,000 and who enters into the agreement, contract, or transaction in order to manage the risk associated with an asset owned or liability incurred, or reasonably likely to be owned or incurred, by the individual;

**(B)**

    **(i)** a person described in clause (i), (ii), (iv), (v), (viii), (ix), or (x) of subparagraph (A) or in subparagraph (C), acting as broker or performing an equivalent agency function on behalf of another person described in subparagraph (A) or (C); or

    **(ii)** an investment adviser subject to regulation under the Investment Advisers Act of 1940 [15 U.S.C. 80b–1 et seq.], a commodity trading advisor subject to regulation under this chapter, a foreign person performing a similar role or function subject as such to foreign regulation, or a person described in clause (i), (ii), (iv), (v), (viii), (ix), or (x) of subparagraph (A) or in subparagraph (C), in any such case acting as investment manager or fiduciary (but excluding a person acting as broker or performing an equivalent agency function) for another person described in subparagraph (A) or (C) and who is authorized by such person to commit such person to the transaction; or

**(C)** any other person that the Commission determines to be eligible in light of the financial or other qualifications of the person.

49

**7 U.S.C. § 2(c)(2)(C)(iii)(I)(cc)**

(C) (i)

(I) This subparagraph shall apply to any agreement, contract, or transaction in foreign currency that is—

> (aa) offered to, or entered into with, a person that is not an eligible contract participant (except that this subparagraph shall not apply if the counterparty, or the person offering to be the counterparty, of the person that is not an eligible contract participant is a person described in any of item (aa), (bb), (ee), or (ff) of subparagraph (B)(i)(II)); and

> (bb) offered, or entered into, on a leveraged or margined basis, or financed by the offeror, the counterparty, or a person acting in concert with the offeror or counterparty on a similar basis.

(II) Subclause (I) of this clause shall not apply to—

> (aa) a security that is not a security futures product; or

> (bb) a contract of sale that—

> (AA) results in actual delivery within 2 days; or

> (BB) creates an enforceable obligation to deliver between a seller and buyer that have the ability to deliver and accept delivery, respectively, in connection with their line of business.

(ii)

> (I) Agreements, contracts, or transactions described in clause (i) of this subparagraph, and accounts or pooled investment vehicles described in clause (vii), shall be subject to subsection (a)(1)(B) of this section and sections 6(b), 6b, 6c(b), 6o, 9, and 13b of this title (except to the extent that sections 9 and 13b of this title prohibit manipulation of the market price of any commodity in interstate commerce, or for future delivery on or subject to the rules of any market), 13a–1, 13a–2, 12(a), 13c(a), and 13c(b) of this title.

> > (II) Subclause (I) of this clause shall not apply to—

> > (aa) any person described in any of item (aa), (bb), (ee),[1] or (ff) of subparagraph (B)(i)(II); or

50

(bb) any such person's associated persons.

(III) The Commission may make, promulgate, and enforce such rules and regulations as, in the judgment of the Commission, are reasonably necessary to effectuate any of the provisions of or to accomplish any of the purposes of this chapter in connection with agreements, contracts, or transactions described in clause (i) of this subparagraph if the agreements, contracts, or transactions are offered, or entered into, by a person that is not described in item (aa) through (ff) of subparagraph (B)(i)(II).

(iii)

(I)A person, unless registered in such capacity as the Commission by rule, regulation, or order shall determine and a member of a futures association registered under section 21 of this title, shall not—

(aa) solicit or accept orders from any person that is not an eligible contract participant in connection with agreements, contracts, or transactions described in clause (i) of this subparagraph entered into with or to be entered into with a person who is not described in item (aa), (bb), (ee), or (ff) of subparagraph (B)(i)(II);

(bb) exercise discretionary trading authority or obtain written authorization to exercise written trading authority over any account for or on behalf of any person that is not an eligible contract participant in connection with agreements, contracts, or transactions described in clause (i) of this subparagraph entered into with or to be entered into with a person who is not described in item (aa), (bb), (ee),[1] or (ff) of subparagraph (B)(i)(II); or

(cc) operate or solicit funds, securities, or property for any pooled investment vehicle that is not an eligible contract participant in connection with agreements, contracts, or transactions described in clause (i) of this subparagraph entered into with or to be entered into with a person who is not described in item (aa), (bb), (ee), or (ff) of subparagraph (B)(i)(II).

**7 U.S.C. § 6k(2) Registration of associates of futures commission merchants, commodity pool operators, and commodity trading advisors; required disclosure of disqualifications; exemptions for associated persons**

(2) It shall be unlawful for any person to be associated with a commodity pool operator as a partner, officer, employee, consultant, or agent (or any person occupying a similar status or performing similar functions), in any capacity that involves (i) the solicitation of funds, securities, or property for a participation in a commodity pool or (ii) the supervision of any person or persons so engaged, unless such person is registered with the Commission under this chapter as an associated person of such commodity pool operator and such registration shall not have expired, been suspended (and the period of suspension has not expired), or been revoked. It shall be unlawful for a commodity pool operator to permit such a person to become or remain associated with the commodity pool operator in any such capacity if the commodity pool operator knew or should have known that such person was not so registered or that such registration had expired, been suspended (and the period of suspension has not expired), or been revoked. Any individual who is registered as a floor broker, futures commission merchant, introducing broker, commodity pool operator, or as an associated person of another category of registrant under this section (and such registration is not suspended or revoked) need not also register under this paragraph. The Commission may exempt any person or class of persons from having to register under this paragraph by rule, regulation, or order.

7 U.S.C. § 6m(1) Use of mails or other means or instrumentalities of interstate commerce by commodity trading advisors and commodity pool operators; relation to other law

**(1)** It shall be unlawful for any commodity trading advisor or commodity pool operator, unless registered under this chapter, to make use of the mails or any means or instrumentality of interstate commerce in connection with his business as such commodity trading advisor or commodity pool operator: Provided, That the provisions of this section shall not apply to any commodity trading advisor who, during the course of the preceding twelve months, has not furnished commodity trading advice to more than fifteen persons and who does

52

not hold himself out generally to the public as a commodity trading advisor. The provisions of this section shall not apply to any commodity trading advisor who is a (1) dealer, processor, broker, or seller in cash market transactions of any commodity specifically set forth in section 2(a) of this title prior to October 23, 1974, (or products thereof) or (2) nonprofit, voluntary membership, general farm organization, who provides advice on the sale or purchase of any commodity specifically set forth in section 2(a) of this title prior to October 23, 1974; if the advice by the person described in clause (1) or (2) of this sentence as a commodity trading advisor is solely incidental to the conduct of that person's business: Provided, That such person shall be subject to proceedings under section 18 of this title.

17 C.F.R. § 4.20

**(b)** All funds, securities or other property received by a commodity pool operator from an existing or prospective pool participant for the purchase of an interest or as an assessment (whether voluntary or involuntary) on an interest in a pool that it operates or that it intends to operate must be received in the pool's name.

**(c)** No commodity pool operator may commingle the property of any pool that it operates or that it intends to operate with the property of any other person.

17 C.F.R. § 4.21

**(a)**

> **(1)** Subject to the provisions of paragraph (a)(2) of this section, each commodity pool operator registered or required to be registered under the Act must deliver or cause to be delivered to a prospective participant in a pool that it operates or intends to operate a Disclosure Document for the pool prepared in accordance with §§ 4.24 and 4.25 by no later than the time it delivers to the prospective participant a subscription agreement for the pool; *Provided,* That any information distributed in advance of the delivery of the Disclosure Document to a prospective participant is consistent with or amended by the information contained in the Disclosure Document and with

the obligations of the commodity pool operator under the Act, the Commission's regulations issued thereunder, and the laws of any other applicable federal or state authority; *Provided, further,* That in the event such previously distributed information is amended by the Disclosure Document in any material respect, the prospective participant must be in receipt of the Disclosure Document at least 48 hours prior to its subscription being accepted by the pool operator.

**(2)** For the purpose of the Disclosure Document delivery requirement, including any offering memorandum delivered pursuant to § 4.7(b)(1) or 4.12(b)(2)(i), the term "prospective pool participant" does not include a commodity pool operated by a pool operator that is the same as, or that controls, is controlled by, or is under common control with, the pool operator of the offered pool.